**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

DAVID GRAHAM GOODMAN,

                  Plaintiff,

v.

KENNETH W. STOLLE, ET AL.,

                  Defendants.

**Civil Action No. 1:13-cv-540**

## MEMORANDUM IN SUPPORT OF
## MOTION FOR SANCTIONS PURSUANT TO RULE 37(e)

Philip A. Sechler (*pro hac* vice)
Lauren C. Andrews (VA Bar No. 92149)
ROBBINS, RUSSELL, ENGLERT,
   ORSECK & UNTEREINER LLP
2000 K Street, N.W., 4th Floor
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
landrews@robbinsrussell.com

*Counsel for Plaintiff*

Dated: November 5, 2021

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

FACTUAL BACKGROUND .............................................................................. 2

    A.    First Incident ................................................................................. 2

    B.    Second Incident............................................................................ 3

    C.    Spoliation of the Video Footage ................................................. 5

ARGUMENT ...................................................................................................... 8

I.    SPOLIATION OF THE VIDEO FOOTAGE SHOULD BE IMPUTED TO THE DEFENDANTS ........................................................................................ 9

II.    DELETION OF THE VIDEO FOOTAGE CONSTITUTES SPOLIATION ................. 13

    A.    The VBSO Had A Duty To Preserve The Video Footage. ................................. 13

        1.    The VBSO Should Reasonably Have Anticipated Litigation Within Thirty Days Of The Incident..................... 14

        2.    The VBSO Should Reasonably Have Known That The Video Footage Was Relevant .................................. 15

    B.    The Video Footage Was Lost ............................................................ 16

    C.    The VBSO Failed To Take Reasonable Steps To Preserve The Video Footage .. 16

    D.    The Lost Video Footage Cannot Be Replaced Through Additional Discovery ... 17

III.    THE COURT SHOULD ORDER SANCTIONS TO ADDRESS THE SPOLIATION AND REMEDY PLAINTIFF'S SIGNIFICANT PREJUDICE ....................................... 18

    A.    There Is Evidence That The VBSO's Spoliation Was Intentional ....................... 19

    B.    Alternatively, The VBSO's Spoliation Was At Least Grossly Negligent ........... 20

    C.    Goodman Has Been Severely Prejudiced By The Loss Of The Videos ............... 21

CONCLUSION................................................................................................... 23

Plaintiff David Graham Goodman submits this memorandum in support of his motion for sanctions pursuant to Rule 37(e) of the Federal Rules of Civil Procedure.

## INTRODUCTION

On November 7, 2012, David Goodman was assaulted by four officers—Defendants Diggs, Hayes, Moissett, and Repass—while he was jailed at the Virginia Beach Correctional Center. They left him severely injured, with neck and back trauma that today confines him to a wheelchair. Goodman has spent nearly nine years since the assault pursuing his claims against the Defendants for excessive use of force. There is no question that Defendants used some force in their interactions with Goodman that day, but each denies (contrary to Goodman's testimony) that the use of force was inappropriate.

There is key evidence that would have corroborated Goodman's account of what happened that day: Security cameras in multiple areas of the jail recorded digital video footage of the assaults. Within hours of the incidents, Goodman specifically told staff at the jail that he wanted to view the videos in anticipation of a lawsuit against Defendants. Defendants' supervisors, and even some of the Defendants themselves, viewed the videos in the days that followed. But despite Goodman's unambiguous request, the videos were destroyed, having been overwritten by other videos in the camera system, and thus irretrievably lost.

This Court has already expressed its concern about Defendants' loss of the clearly relevant video footage. *See* Doc. No. 103 (Mem. Op.) at 10 n.5 ("The absence of the videotape concerns the Court . . . ."). In remanding the case after Goodman's most recent appeal, the Fourth Circuit echoed that concern and criticized Defendants' disingenuous attempts to turn their own spoliation to their advantage. *See Goodman v. Diggs et al.*, 986 F.3d 493, 497 n.6 (4th Cir. 2021) ("We share the district court's concern that supervisors at Virginia Beach Correctional Center, after being

made aware of the incident, would review the video and then fail to preserve it.  That action may warrant an adverse inference against the officers.  We are also disappointed with the officers' invocation of the video in an attempt to bolster their case for summary judgment.")

The loss of this critical evidence despite Goodman's clear request was at least grossly negligent, if not outright intentional.  And Goodman has been enormously prejudiced by the destruction of video footage that would have corroborated his testimony.  Defendants must be held accountable for this spoliation, and this Court should sanction them accordingly.

## FACTUAL BACKGROUND

### A.    First Incident

In November 2012, Goodman was incarcerated at the Chesapeake Correctional Center in Chesapeake, Virginia.  Doc. No. 10 (First Amended Complaint) at 5.[1]  On November 7, 2012, Goodman was transported to the Virginia Beach Correctional Center ("VBCC") to attend a court hearing in Virginia Beach.  *Id.* at 5.  VBCC is a jail operated by the Virginia Beach Sheriff's Office ("VBSO").  *See* Ex. 1 ("About VBCC" from VBSO.net).  Goodman was a disabled veteran; he walked with a cane and was provided a wheelchair when he arrived at VBCC.  Ex. 2 (Goodman Dep.) at 117.

When he returned from court, Goodman was placed on a bench in the intake area of the jail.  Doc. No. 10 at 8.  Defendant Hayes came to take Goodman to his housing assignment for the night.  *Id.*  When Goodman learned he had been assigned to sleep on the floor, he tried to explain to Hayes that he could not sleep on the floor due to his preexisting spinal cord damage.  *Id.*  Hayes

---

[1] The Fourth Circuit held that even though Goodman's second amended complaint (Doc. No. 47) is the operative complaint for pleading purposes, his earlier verified complaints still have evidentiary value as affidavits.  *Goodman*, 986 F.3d at 499.  Accordingly, this memorandum cites to Goodman's earlier complaints as sworn statements based on Goodman's personal knowledge.

2

"grabbed [him[ by the collar of the jumpsuit, dragged [him] off the bench, slammed [him] into the concrete wall, and slammed [him] into the back of the holding cell and left [him on] the floor." Ex. 2 (Goodman Dep.) at 116.  When Hayes grabbed him, Goodman went limp "so [he] wouldn't have the hell beat out of [him] or "get hurt any worse."  Ex. 2 (Goodman Dep.) at 118-19.  Hayes then dragged Goodman across the ground and threw him into a holding cell.  Doc. No. 10 at 8; Ex. 2 (Goodman Dep.) at 116-17.

Hayes tells a different story: He says Goodman refused to get in his wheelchair and dropped his weight to the ground while being walked to the cell, so Hayes had no choice but to drag him into the cell.  *See* Doc. No. 68-3 (Hayes Affidavit).  Hayes admits that he "grabbed Mr. Goodman under his armpits from behind him" and "pulled him across the floor" to the holding cell.  Ex. 3 (Hayes Dep.) at 35-36.

Multiple security cameras in the intake area captured video footage of the incident between Goodman and Hayes.  *See* Doc. No. 68-1 (VBCC Records) at 4 ("DVR 313, camera 12, 13, and 14 were reviewed"); Ex. 4 (Richie Dep.) at 10-11; Ex. 3 (Hayes Dep.) at 66-69.  Shortly after the incident, Hayes pulled up the video footage on a computer, viewed it, and wrote an incident report. Ex. 3 (Hayes Dep.) at 65-66, 69.  The VBSO's policy is that the officer's immediate supervisors will review the video whenever an incident report is submitted.  Ex. 4 (Richie Dep.) at 12-13, 34-35.  In addition, the VBSO's professional standards or internal affairs office must review the video as well as "a secondary check and balance system."  *Id.* at 34-35; *see* Ex. 5 (Use of Force Policy) at 1348.

## B.   Second Incident

Later that same day, the other three Defendants (Diggs, Moissett, and Repass) arrived at the holding cell to take Goodman to his overnight housing assignment.  Doc. No. 10 at 10-12.

While Goodman's wheelchair was being pushed down the hallway to his new cell, Goodman was somehow displaced from his wheelchair (possibly because he passed out or because something locked up the wheels), and suddenly "the deputies were on [him]." Ex. 2 (Goodman Dep.) at 122-24. He had "one standing on [his] back, one had their knee in [his] ribs," and one who had Goodman's "hands behind [his] back trying to rip them out of the socket." *Id.* at 124. Diggs and Moissett slammed Goodman back onto the floor, handcuffed him, and dragged him down the rest of the hallway to his cell, where they once again slammed him onto the floor. *Id.* at 125-28; Doc. No. 10 at 10-11. As Goodman's handcuffs were being removed, Diggs stood on his back, while Repass stood or knelt on his neck and left hand and also placed a finger on the pressure point behind his right ear. Ex. 2 (Goodman Dep.) at 128; Doc. No. 10 at 11-13. Goodman was rendered unconscious and was left "laying [on] the floor in the corner" of his cell until another deputy called for medical attention. Ex. 2 (Goodman Dep.) at 129.

The officers again tell a different story. They insist that Goodman purposefully threw himself out of his wheelchair and tried to bang his head on the walls or doorframes on the way to his cell. *See* Doc. No. 68-4 (Repass Affidavit); Doc. No. 68-5 (Diggs Affidavit); Doc. No. 68-6 (Moissett Affidavit). But Diggs did admit that he and Repass "grabbed him by his wrist, forearm, underneath his armpit, [and] just physically started dragging him down the hallway." Ex. 6 (Diggs Dep.) at 29-30. Diggs also admitted that he put his knee on Goodman's back between his shoulder blades, and Repass admitted that she used a pressure point as "pain compliance." *Id.* at 49; Ex. 7 (Repass Dep.) at 23.

Once again, multiple security cameras captured video footage of the incident between Goodman and these three Defendants. *See* Doc. No. 68-1 at 5 ("DVR 311 cameras 11 & 13 were reviewed by all parties involved"). Repass, who wrote the incident report noting a review of the

cameras "by all parties involved," reviewed the video.  Ex. 7 (Repass Dep.) at 40.  It is not clear whether Diggs or Moissett reviewed the video, although Linda Richie (the former commanding officer of internal affairs) testified on behalf of the VBSO that Moissett would have reviewed the video as Repass' supervisor to ensure that her report was accurate, and Diggs testified he reviewed Repass' report, which (as noted) indicates review of the video footage "by all parties involved." Ex. 4 (Richie Dep.) at 48-49; Ex. 6 (Diggs Dep.) at 53.  The internal affairs office also reviewed the video.  Ex. 7 (Richie Dep.) at 49-50.

As a result of these combined assaults, Goodman sustained serious injuries to his neck, back, right shoulder, and left hand.  Ex. 2 (Goodman Dep.) at 24.  He was found "laying on [his] left side" in his cell with "dark red blood pooled on [the] floor around [his] face," and was treated that night for a head wound and possible concussion.  Doc. No. 68-1 at 2.  He had surgery on his left hand in 2013 and continues to experience severe neck, back, and shoulder pain.  Ex. 2 (Goodman Dep.) at 26-27, 97-98.  He also still requires pain medication to this day, although the medication he currently receives is not enough for his pain.  *Id.* at 102-03.

C.        **Spoliation of the Video Footage**

Soon after these incidents occurred, Goodman specifically requested the video footage from the VBSO for purposes of litigation.  While being treated by medical staff following the second incident, Goodman told the nurse he wanted to view the videos for a lawsuit against the officers involved, which the nurse recorded in her medical notes as part of Goodman's VBCC records.  *See* Doc. No. 68-1 at 2 ("Inmate stated he was upset and expressed his interest in viewing the videos for a lawsuit against those involved in the incident.").  Because he was returned to Chesapeake Correctional Center early the next morning, Goodman did not have the chance to file

a grievance at Virginia Beach Correctional Center, but he did file an incident report upon his return to Chesapeake.  Doc. No. 10 at 4-6; Doc. No. 10-2 at 19-20.

Throughout the early stages of this lawsuit, Goodman repeatedly reiterated his request for the videos of both incidents.  *See, e.g.*, Doc. No. 8 (Pl's Motion for Discovery); Doc. No. 63 (Pl's Letter to Court).  Defendants opposed those requests and stated that they would "require substantial time and effort and the production of voluminous, irrelevant documents *and/or video tapes*."  Doc. No. 64 (Defs' Opp. to Pl's Motion for Discovery) at 2 (emphasis added).  Incredibly, Defendants then turned around and filed for summary judgment, arguing that they were entitled to summary judgment in part because "security camera footage . . . confirmed Dep. Hayes' report of the incident."  Doc. No. 68 (Defs. Mem. In Support Of Summary Judgment) at 2.  On June 24, 2015, the Court ordered Defendants to produce the video footage to Goodman and the Court, stating that Goodman was "entitled to view the video footage" because "defendants appear to have relied on this very security footage in an exhibit in support of their Motion."  *See* Doc. No. 72 (6/24/15 Order) at 7.

The Court's June 24 order, however, finally brought Defendants' spoliation to light. Captain Linda Richie, the Commanding Officer of the Professional Standards and Legal Division of the VBSO, revealed that "the video footage was reviewed by the deputies' supervisor, and internal affairs division," but that the footage had since been automatically overwritten by the jail video system.  *See* Doc. No. 74 (Richie Affidavit).  In her sworn affidavit, Richie stated that the video system automatically overwrites videos after thirty days "unless they are downloaded for preservation," which did not happen in this instance "[b]ecause there were no violations of policy; nor evidence of any excessive force; and no complaint by the inmate at the time."  *Id.*  At her deposition as a witness on behalf of the VBSO, Richie testified that the VBSO's policy at the time

was to preserve video if they anticipated litigation[2] or if an inmate made a complaint. Ex. 4 (Richie Dep.) at 18-19. This would include an inmate complaint made to medical staff, who were then required to notify either their "medical liaison supervisor" or the internal affairs office about the complaint. *Id.* at 20. However, testifying on behalf of the VBSO, Richie claimed to have no knowledge of whether the nurse who treated Goodman on November 7, 2012, notified anyone about Goodman's complaint and his express request for the videos. *Id.* at 54.

Defendants subsequently renewed their motion for summary judgment, still relying on the video footage despite their admitted inability to produce it. *See* Doc. No. 96. This Court granted the motion, but noted that "[t]he absence of the videotape concerns the Court, particular since, according to the nurse that examined the plaintiff, the plaintiff had stated his interest in viewing the videotape for a lawsuit shortly after the alleged incidents," and advised Defendants "that in the future it will critically examine the failure to preserve videotapes of physical altercations with inmates." Doc. No. 103 at 10-11 n.5.

On appeal, the Fourth Circuit vacated the grant of summary judgment, and stated, "We share the district court's concern that supervisors at Virginia Beach Correctional Center, after being made aware of the incident, would review the video and then fail to preserve it. ***That action may warrant an adverse inference against the officers.*** We are also disappointed with the officers' invocation of the video in an attempt to bolster their case for summary judgment. . . . We do not view favorably this heads-I-win-tails-you-lose attempt to wield the video to exculpate the officers without making it available to Goodman." *Goodman*, 986 F.3d at 497 n.6 (emphasis added).

---

[2] Richie also testified that the VBSO would preserve a video if they received a litigation hold, but she "do[es] not believe" any litigation hold was issued in this case. Ex. 4 (Richie Dep.) at 57.

**ARGUMENT**

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001).  The purposes of sanctions for spoliation include "(1) deterring parties from engaging in spoliation; (2) placing the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."  *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 103 (E.D. Va. 2018) (internal alterations and quotation marks omitted).  "Recognizing acts of spoliation and punishing the spoliators is the result of judicial recognition that the spoliated physical evidence is often the best evidence as to what has really occurred and that there is an inherent unfairness in allowing a party to destroy evidence and then to benefit from that conduct."  *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 284 (E.D. Va. 2001) (internal quotation marks omitted).

Sanctions for spoliation have "a long history in the common law," but as of 2015, Federal Rule of Civil Procedure 37(e) exclusively governs the remedies for spoliation of electronically stored information ("ESI"), including digital videos.  *See Bistrian v. Levi*, 448 F. Supp. 3d 454, 465-67 (E.D. Pa. 2020); *see* Ex. 4 (Richie Dep.) at 10 (jail uses a digital video recording system).[3] Rule 37(e) provides for a four-part test for spoliation:  "(1) ESI should have been preserved; (2) ESI was lost; (3) the loss was due to a party's failure to take reasonable steps to preserve the ESI;

---

[3] Courts have routinely applied Rule 37(e) to spoliation that occurred before 2015 where, as here, "its application . . . would not be infeasible or work an injustice."  *See Jenkins v. Woody*, 2017 WL 362475, at *13 (E.D. Va. Jan. 21, 2017) (ordering sanctions for under Rule 37(e) for spoliation of jail video that occurred in 2014); *Muhammad v. Mathena*, 2016 WL 8116155, at *8 n.9, *9 (W.D. Va. Dec. 12, 2016) (ordering sanctions under Rule 37(e) for spoliation of jail video that occurred in 2013).

and (4) the ESI cannot be restored or replaced through additional discovery." *Steves*, 327 F.R.D. at 104; *see* Fed. R. Civ. P. 37(e). This mirrors the traditional test for spoliation sanctions under the court's inherent power, which "asks whether the responsible party had a duty to preserve, and breached that duty by failing to take reasonable steps to preserve." *Steves*, 327 F.R.D. at 104. "In the Fourth Circuit, any level of fault, whether it is bad faith, willfulness, gross negligence, or ordinary negligence, suffices to support a finding of spoliation." *E.I. du Pont de Nemours and Co. v. Kolon Indust., Inc.* 803 F. Supp. 2d 469, 497 (E.D. Va. 2011); *see Muhammad*, 2016 WL 8116155, at *5 (applying the same principle in the Rule 37(e) context).

If the Court finds there was spoliation, it must then determine the appropriate sanction. If the spoliating party "acted with the intent to deprive another party of the information's use in the litigation," Rule 37(e)(2) provides for harsher sanctions, including an adverse inference instruction or default judgment. Otherwise, Rule 37(e)(1) governs, and the moving party need show only "prejudice to another party from loss of the information" in order for the court to grant "measures no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Even then, "it may be that serious measures are necessary to cure prejudice found by the court, such as forbidding the party that failed to preserve the information from putting on certain evidence, permitting the parties to present evidence and argument to the jury regarding the loss of information, or giving the jury instructions to assist in its evaluation of such evidence or argument." Fed. R. Civ. P. 37(e) advisory committee notes to 2015 amendment; *see Jenkins*, 2017 WL 362475, at *18.

## I. SPOLIATION OF THE VIDEO FOOTAGE SHOULD BE IMPUTED TO THE DEFENDANTS.

As a threshold matter, sanctions are appropriate against the four individual officers named as defendants in this case, even if they were not the specific individuals responsible for failing to

preserve the video.  If the Court finds that the VBSO is responsible for spoliation of the video footage of the incidents with Goodman, that spoliation should be imputed to Defendants.

The Fourth Circuit has held that an individual can be sanctioned for the destruction of evidence that he "did not own" or "even control … in a legal sense," particularly where the individual had access to the evidence.  *See Silvestri*, 271 F.3d at 591.  Parties are obligated to "preserve potentially relevant evidence under their 'control,'" including "when that party has the right, authority, or practical ability to obtain the [evidence] from a non-party to the action." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 523 (D. Md. 2010).  The duty to preserve relevant evidence extends to non-parties if they have "some special relationship or duty arising by reason of an agreement, contract, statute or other special circumstance." *Johns v. Gwinn*, 503 F. Supp. 3d 452, 463 (W.D. Va. 2020) (quoting *Wilson v. Beloit Corp.*, 921 F.2d 765, 767 (8th Cir. 1990)).

Courts in this Circuit and elsewhere have since applied this principle specifically to the spoliation of video evidence by correctional departments.  *See Johns*, 503 F. Supp. 3d at 470, 474 (imposing sanctions on defendant officer for spoliation by Virginia Department of Corrections ("VDOC")); *Raynor v. Pugh*, 1:13cv01117 (LMB/JFA), E.D. Va., Mem. Op. and Order, ECF No. 199, at 30 n.12 (filed Oct. 21, 2016) (imposing sanctions on defendant officer based on VDOC's duty to "preserve evidence related to a potential case against its employees when it is aware that litigation is reasonably likely"); *Harvey v. Hall*, 2019 WL 1767568, at \*5-6 (W.D. Va. Apr. 22, 2019) (holding defendant officers responsible for spoliation conduct of VDOC and prison officials); *Muhammad*, 2016 WL 8116155, at \*8 (imputing prison officials' spoliation to defendant officers); *Pettit v. Smith*, 45 F. Supp. 1099 (D. Ariz. 2014) (imposing sanctions on defendant officers for spoliation by Arizona Department of Corrections); *Woods v. Scissons*, 2019 WL

3816727, at *6 (D. Ariz. Aug. 14, 2019) (imputing city police department's spoliation to defendant officer).[4]  Because "correctional departments and municipalities ultimately bear the responsibility for preserving evidence and litigating cases filed by prisoners . . . their failure to preserve evidence may be imputed to individual officer defendants in order to avoid unfair prejudice to inmate litigants." *Johns*, 503 F. Supp. 3d at 463 (internal quotation marks omitted).  Otherwise, inmates who file cases against the officers that violate their constitutional rights will have no remedy for spoliation.

The VBSO is the entity responsible for investigating incidents involving use of force, keeping records of those investigations, and storing and preserving video recordings.  *See* Ex. 8 (Security Equipment Recordings Directive); Ex. 9 (Professional Standards and Accountability Policy).  And when this Court ordered Defendants to produce the video recordings, it was the VBSO who responded, and the VBSO who revealed that "the Sheriff's Department cannot provide a copy of the requested videotape."  *See* Doc. No. 74.

 Defendants' closely intertwined relationship with the VBSO means that they and the VBSO share a duty to preserve, and that the VBSO's spoliation should be imputed to them.  In *Johns*, the court held that the Virginia Department of Corrections had a duty to preserve evidence because of its "special relationship" with the individual officer defendant.  *Johns*, 503 F. Supp. 3d at 463.  Here, as in *Johns*, the VBSO employed and trained Defendants.  Furthermore, the VBSO

---

[4] Goodman is obliged to point out that the Fourth Circuit, in an unpublished opinion, affirmed an order from this district denying sanctions against a correctional officer for VDOC's loss of a video.  *See Boone v. Everett*, 751 Fed. App'x 200, 402 (4th Cir. 2019).  That opinion is not binding on this court and furthermore is distinguishable.  The individual officer defendant in *Boone* "viewed the video once" but "did not have the ability to access the video himself."  *Id.*  In this case, Defendants, their supervisors, and VBSO internal affairs officers all viewed the video, and specifically relied on it in Defendants' incident reports, subsequent internal investigations, and Defendants' motion for summary judgment.

is closely involved in Defendants' defense—all four Defendants have talked about this lawsuit with Captain Richie (the former Commanding Officer of the Professional Standards and Legal Division who submitted an affidavit regarding the VBSO's inability to produce the video recordings). Defendants also share the same counsel who represented Captain Richie and Sheriff Stolle.[5] *See* Ex. 3 (Hayes Dep.) at 75; Ex. 7 (Repass Dep.) at 50-51; Ex. 6 (Diggs Dep.) at 68-69; Ex. 10 (Moissett Dep.) at 67; *see also Johns*, 503 F. Supp. 3d at 463 (noting VDOC's involvement in defendant's defense); *Harvey*, 2019 WL 1767568, at *6 (noting that defendants "were all acting in their capacities as employees of either ROSP or VDOC, the institutions that ultimately bear responsibility for preserving evidence and litigating cases filed by prisoners") (internal quotation marks omitted).

Defendants here also "benefitted substantially from use of the evidence that was destroyed before Plaintiff received access to it." *Johns*, 503 F. Supp. 3d at 464. Defendants' supervisors and the internal affairs office of the VBSO claim to have determined, allegedly based on the video footage, that no formal investigation or disciplinary action should be pursued against Defendants. *See* Ex. 4 (Richie Dep.) at 32, 50-51. Defendants themselves clearly had access to the video footage: Hayes was able to view the footage on a computer, and Repass and Moissett either reviewed or had access to the footage. *See* Ex. 3 (Hayes Dep.) at 65-66, 59; Ex. 7 (Repass Dep.) at 40; Ex. 4 (Richie Dep.) at 48-49. Hayes and Repass, the only two officers who submitted formal incident reports, both referred to the videos in their reports. *See* Doc. No. 96-1 at 4 (Hayes incident report), 5 (Repass incident report). Indeed, all Defendants cited the video footage in their motion for summary judgment.

---

[5] Virginia Beach Sheriff Kenneth Stolle was originally named as a defendant but was dismissed. *See* Doc. No. 35.

The fact that these four individuals do not themselves operate the jail's video recording system does not preclude the Court from sanctioning them for spoliation. *See Muhammad*, 2016 WL 8116155, at *7 (sanctioning defendants even though neither was "personally involved in any of the decisions that led to the loss of the surveillance video"). The VBSO's spoliation of the videos of both incidents must be imputed to Defendants in order to avoid unjust and absurd results; otherwise, a "correctional facility could wrongly destroy any piece of evidence in its control with near-zero risk of consequence in prisoner suits." *Johns*, 503 F. Supp. 3d at 464. The VBSO's spoliation is inextricably linked to Defendants' defense in this case. To prevent injustice to Goodman, this Court should find that the VBSO, like Defendants, had a duty to preserve relevant evidence, and that any spoliation by the VBSO merits sanctions against Defendants.

## II.    DELETION OF THE VIDEO FOOTAGE CONSTITUTES SPOLIATION.

The record is clear that the VBSO spoliated the video footage of the incidents involving Goodman. The VBSO had a duty to preserve this highly relevant evidence in anticipation of litigation; the evidence was lost because the VBSO failed to take reasonable (or indeed any) steps to preserve it; and that loss is permanent and irreparable.

### A.    The VBSO Had A Duty To Preserve The Video Footage.

The first inquiry in assessing spoliation under Rule 37(e) is whether the party had a duty to preserve the evidence. The duty to preserve turns on "(1) whether [the spoliator] should reasonably have anticipated litigation" and "(2) whether he should reasonably have known that the evidence he deleted might be relevant to such litigation." *Steves*, 327 F.R.D. at 105; *Jenkins*, 2017 WL 362475, at *14.

1.  The VBSO Should Reasonably Have Anticipated Litigation Within Thirty Days
    Of The Incident.

Prison officials should reasonably expect litigation when an inmate suffers a serious injury, even if a lawsuit has not yet been filed or even threatened, because "[i]ncidents in which inmates are injured in prison" are "especially likely to lead to litigation." *Bistrian*, 448 F. Supp. 3d at 469; *see also Taylor v. City of N.Y.*, 293 F.R.D. 601, 610 (S.D.N.Y. 2013) ("Defendants should have reasonably anticipated that Plaintiff would file a lawsuit against the DOC . . . because the DOC has documented that, in the hundreds of other instances where inmates have been injured while in DOC custody, lawsuits by the injured inmates against the agency have invariably ensued."); *Barnes v. Harling*, 368 F. Supp. 3d 573, 607 (W.D.N.Y. 2019) (duty to preserve where an inmate was involved in a physical altercation); *Alston v. Bellerose*, 2016 WL 4098726 (D. Conn. Jul. 28, 2016), at *2 (same).

Defendants knew that their altercations with Goodman were serious incidents.  Hayes and Repass noted in their incident reports that Goodman was given medical attention after each incident.  *See* Doc. No. 68-1 at 4-5.  The nurse at VBCC recorded that Goodman was treated for a head wound and possible concussion that night.  *Id.* at 2-3.  And the VBSO's policy was for both supervisors and the internal affairs office to investigate and review any incidents involving use of force, which they did here.  Ex. 4 (Richie Dep.) at 12-13; Ex. 5 (Use of Force Policy) at 1348. This "commonsense policy" of conducting immediate investigations "likely exists, at least in part, because of a reasonable anticipation of litigation."  *See Jenkins*, 2017 WL 362475, at *15.

Furthermore, Goodman's "request for evidence preservation [and his] threat of litigation" also triggered the duty to preserve evidence.  *Steves*, 327 F.R.D. at 106.  In the context of prison litigation, "courts often consider whether the inmate-plaintiff alerted prison officers to the footage and requested its preservation."  *Johns*, 503 F. Supp. 3d at 466.  The day of the incidents, Goodman

14

did precisely that: He told a nurse at the Virginia Beach Correctional Center that he wanted to "view[] the videos for a lawsuit against those involved." *See* Doc. No. 68-1 at 2.  This statement to correctional staff, which according to VBSO policy should have resulted in the preservation of the videos, put the VBSO on constructive notice of Goodman's complaint. *See* Ex. 4 (Richie Dep.) at 19 ("Anything that someone that was in our facility would have complained about, we would have preserved the video.").  Furthermore, Defendants and the VBSO were "well aware of the footage," since they specifically viewed it in connection with reviewing Defendants' actions. *See Johns*, 503 F. Supp. 3d at 467.  The VBSO should reasonably have anticipated that Goodman might file suit against the Defendants shortly after the incidents, and certainly within the thirty-day period before the video recordings were automatically overwritten.

## 2. The VBSO Should Reasonably Have Known That The Video Footage Was Relevant.

"When reasonably anticipating litigation, a party must preserve what it knows, or reasonably should know, is relevant in the action, or is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." *Jenkins*, 2017 WL 362475, at *15 (internal alterations and quotation marks omitted).  A party "must not destroy unique, relevant evidence that might be useful to an adversary." *Id.* (internal quotation marks omitted).

The VBSO unquestionably should have known—and indeed did know—that the video footage of the two incidents on November 7 was highly relevant to Goodman's claims.  This was not some ancillary piece of evidence; the cameras captured nearly all areas of the jail in which the assaults occurred. *See* Ex. 3 (Hayes Dep.) at 66-69; Ex. 7 (Repass Dep.) at 40-41.  The VBSO was well aware of the content of the videos, given that Defendants' supervisors and internal affairs officers reviewed the footage.  "What's more, the record demonstrates that [VBSO and Defendants] appreciated the relevance of this video to Plaintiff's allegations." *Johns*, 503 F. Supp.

3d at 467.  The VBSO's stated policy of reviewing the video for "all incident reports" recognizes the obvious relevance of videos that show officers using force against inmates.  *See* Ex. 4 (Richie Dep.) at 13.  Defendants themselves acknowledged the relevance of the videos to both the VBSO's internal review (since the videos were cited in Hayes' and Repass' incident reports) and to this litigation in particular (since Defendants relied on the video evidence in their summary judgment motion).  And as explained above, the VBSO was on notice that Goodman had specifically requested the video footage for purposes of litigation.

### B.    The Video Footage Was Lost.

It is undisputed that the video footage of both incidents has been destroyed.  Richie's sworn affidavit in 2015 explained that "the videotape in question was never downloaded and preserved for future use" and could not be produced.  *See* Doc. No. 74.  Richie confirmed in her deposition on behalf of the VBSO that the video footage of both incidents involving Goodman were automatically overwritten by the jail's video system.  *See* Ex. 4 (Richie Dep.) at 32, 49-50.  This key evidence is permanently lost.

### C.    The VBSO Failed To Take Reasonable Steps To Preserve The Video Footage.

The VBSO's failure to download and save the video footage before it was automatically overwritten plainly caused the loss of this critical evidence.  The VBSO took no steps whatsoever, let alone reasonable ones, to prevent the loss of the videos.  They did not follow their policy with respect to inmate complaints.  *See* Ex. 4 (Richie Dep.) at 19.  Contrary to their written policy "for the security and accountability of the digital video recordings (DVR) obtained from the facility surveillance system," they did not preserve the recordings in an encrypted format or maintain it in accordance with their records retention policy.  *See* Ex. 8 (Security Equipment Recordings Directive) at 075-076.

16

The fact that the VBSO's loss of the videos was due to automatic overwriting, rather than affirmative deletion, does not alter the conclusion that this was spoliation.  When a party has a routine document destruction or retention policy in place, it must suspend that policy in order to ensure the preservation of relevant evidence.  *See E.I. duPont*, 803 F. Supp. 2d at 496.  Suspension of such a policy is part of the "reasonable steps to preserve relevant information" that a party must undertake when it anticipates litigation.  *Steves*, 327 F.R.D. at 108.  The VBSO was therefore required to stop the automatic overwriting of the videos of these incidents, but despite having notice of the videos' relevance and Goodman's desire to view them, the VBSO admittedly allowed the automatic overwriting to proceed.

### D.   The Lost Video Footage Cannot Be Replaced Through Additional Discovery.

Lastly, it is undisputed that the lost video footage cannot be restored or replaced through additional discovery.  The video was automatically overwritten by the jail's video system, and as a result Defendants failed to produce it in response to the Court's order.  *See* Doc. No. 74.

Nor can the video evidence be replaced by some other source or additional discovery.  The video is "the best and most objective evidence of whatever happened" to David Goodman on November 7, 2012.  *See Jenkins*, 2017 WL 362475, at *16.  Whatever evidence Goodman presents at trial would plainly be corroborated and bolstered by objective video evidence.  "The significance of such video evidence to Plaintiff's claims can hardly be overstated."  *Johns*, 503 F. Supp. 3d at 467.

The VBSO, by virtue of their special relationship with Defendants in this litigation, had a duty to preserve any and all evidence relevant to Goodman's excessive force claims.  They were well aware of the relevance of the videos that recorded the incidents involving Goodman and Defendants, and yet they allowed the jail's system to automatically overwrite the videos.

Regardless of their level of fault, the VBSO has spoliated evidence in this lawsuit, and Defendants must bear the burden of accountability for that spoliation.

### III.     THE COURT SHOULD ORDER SANCTIONS TO ADDRESS THE SPOLIATION AND REMEDY PLAINTIFF'S SIGNIFICANT PREJUDICE.

Given that the failure to preserve the highly relevant video footage was spoliation, the Court must determine what sanctions should be imposed on Defendants.  Goodman must be able to hold the VBSO accountable for ignoring his requests and losing highly relevant, objective evidence that would have corroborated his testimony at trial.  The only way for Goodman to be made whole, and for the VBSO to suffer the consequences of its misconduct, is for the individual Defendants to be sanctioned.

Before 2015, courts considered "the degree of culpability and the extent of the prejudice" in assessing sanctions.  *See E.I. du Pont*, 803 F. Supp. 2d at 499-500; *Trigon*, 204 F.R.D. at 288. Rule 37(e) still focuses the inquiry on these two factors:  The type of sanction depends on whether the spoliator "acted with the intent to deprive another party of the information's use in the litigation."  *See* Fed. R. Civ. P. 37(e)(2).  If the court finds such intent, it may order an adverse inference jury instruction, draw the adverse inference itself, or even order dismissal or default judgment.  *Id.*  And in the Fourth Circuit, the spoliator's conduct need not be in bad faith to rise to the level of intentional, willful, or deliberate spoliation.  *See E.I. du Pont*, 803 F. Supp. 2d at 497; *Jenkins*, 2017 WL 36247,5 at *17.

If the court does not find that the spoliator acted intentionally, it still has a wide range of measures available upon a finding that the other party was prejudiced.  *See Jenkins*, 2017 WL 362475, at *18 (citing Fed. R. Civ. P. 37(e) advisory committee notes to 2015 amendment).  If necessary, the court may order "serious measures . . . to cure prejudice."  *Id.* (internal quotation marks omitted).

**A.      There Is Evidence That The VBSO's Spoliation Was Intentional.**

Failure to preserve evidence that causes the loss of relevant information "may amount to negligence, gross negligence, or even intentional misconduct." *Victor Stanley*, 269 F.R.D. at 529. There is evidence that the VBSO's failure to preserve the video footage of the incidents with Goodman was intentional, given their actual knowledge of the relevance of the footage for anticipated litigation.

As described above, multiple VBSO officers knew of and reviewed the video footage, from Defendants to their supervisors and the internal affairs office.  According to Richie, who was the commanding officer of internal affairs in November of 2012, the VBSO has a policy of preserving videos of use-of-force incidents if an inmate makes a complaint to staff.  Ex. 4 (Richie Dep.) at 18-19.  Not only did Goodman complain to staff, he specifically requested the preservation of the videos for a lawsuit.  His notice to the VBSO could not have been more clear.  And medical staff are required to notify the internal affairs office of complaints like Goodman's.  *Id.* at 20.

This is clear evidence that the VBSO reviewed the footage and had notice of Goodman's desire to use the videos as evidence in litigation, and nevertheless ignored their own policy (and Goodman's requests) and for preservation of video in response to inmate complaints.  The VBSO's destruction of the video footage despite their internal use of that video, and despite Goodman's explicit request to preserve it for litigation, is strong circumstantial evidence of intentional spoliation.  *See Bistrian*, 448 F. Supp. 3d at 476 ("courts look to circumstantial evidence to determine intent" under Rule 37(e)).  That failure to preserve the video, even if not done in bad faith, was a knowing and willful deviation from VBSO policy, and entitles Goodman to an instruction at trial that the jury must (or may) presume the spoliated video evidence would have been unfavorable to Defendants (in addition to other monetary sanctions).  *See* Fed. R. Civ. P. 37(e)(2)(B).

19

**B.    Alternatively, The VBSO's Spoliation Was At Least Grossly Negligent.**

Even if the Court does not find that the VBSO acted intentionally, the VBSO's conduct certainly rises to the level of gross negligence.  Negligence is "culpable carelessness," while gross negligence "is something more than carelessness, and differs from ordinary negligence only in degree, and not in kind."  *E.I. du Pont*, 803 F. Supp. 2d at 498 (quoting *Victor Stanley*, 269 F.R.D. at 529) (internal alterations omitted).

In the prison litigation context, courts have found that spoliation is at least negligent where officials failed to preserve videos in response to an inmate's request, "either because inadequate procedures were in place to ensure that inmate requests were appropriately processed or because [officials] did not see any need to act on an inmate's request to preserve video evidence." *Muhammad*, 2016 WL 8116155, at *6.  Such failures may even be grossly negligent where the inmate made requests "to save a specific clip of video that could show an officer's use of excessive physical force against him" and prison officials showed "apparent indifference to those requests" despite the "established presence of a policy instructing [department] officials to honor such requests." *Harvey*, 2019 WL 1767568, at *5.

The VBSO was at least grossly negligent in failing to preserve the videos despite Goodman's clear requests.  The VBSO knew that the videos existed and knew they were highly relevant, because officers reviewed the videos after the incidents in order to assess Defendants' use of force.  And the VBSO had an established policy of preserving videos when an inmate makes a complaint, which Goodman clearly did.  Despite all this, the VBSO failed to preserve the videos, and instead allowed them to be irreversibly destroyed.  This ignorance of policy and procedures is more than mere carelessness; it is gross negligence.

20

## C.     Goodman Has Been Severely Prejudiced By The Loss Of The Videos.

Goodman has clearly been prejudiced by the VBSO's destruction of the video footage. A party is prejudiced by spoliation when he "cannot present evidence essential to [his] underlying claim." *Victor Stanley*, 269 F.R.D. at 531 (internal quotation marks omitted). "An evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation." *Johns*, 503 F. Supp. 3d at 470 (quoting Fed. R. Civ. P. 37(e) advisory committee notes to 2015 amendment).

Unlike some cases involving spoliation of prison videos, the importance of these videos cannot be overstated. The security cameras in the intake area showed "the entire incident" between Goodman and Hayes, including everything that happened in the intake area and outside the holding cell. *See* Ex. 3 (Hayes Dep.) at 67-69. It would thus have supported Goodman's claim that Hayes grabbed him, slammed him to the floor, and dragged him to the holding cell. And security cameras captured the hallway and the second building where Repass, Diggs, and Moissett took Goodman to his assigned cell. *See* Ex. 7 (Repass Dep.) at 40-41. That video would thus have corroborated Goodman's claim that he fell out of his wheelchair, and that Diggs and Moissett slammed him onto the floor, handcuffed him, and dragged him down the hallway. Goodman was unquestionably prejudiced by the loss of this highly relevant corroborating evidence. *See Johns*, 503 F. Supp. 3d at 474 (finding prejudice to plaintiff where lost video "would have likely corroborated Plaintiff's testimony").

Indeed, the video of Goodman's altercations with Defendants would almost certainly have been the most critical evidence in this case, as it otherwise turns largely on witness credibility. It is "the best and most compelling evidence of what happened" at the Virginia Beach Correctional Center that day, and would have provided "the only unbiased and dispassionate depiction of events." *See Jenkins*, 2017 WL 362475, at *18.

21

The prejudice is particularly acute for a plaintiff like Goodman, whose case will now turn on his credibility before a jury without objective video evidence to support his story. Goodman is a convicted criminal in a prison jumpsuit, "testify[ing] against uniformed prison guards at trial." *See Pettit*, 45 F. Supp. 3d at 1111 (noting inherent prejudice to prisoners in this situation). "The video camera was an objective witness that bore neither the potential pro-defense leanings of the defense witnesses nor the credibility problems of Plaintiff." *Id.* The VBSO's spoliation has deprived Goodman of the opportunity to make his case with that evidence.

In light of this significant prejudice to Goodman, coupled with the VBSO's gross negligence, this Court should sanction Defendants for the spoliation of this highly relevant and irreplaceable evidence:

First, if Defendants renew their summary judgment motion yet again, this Court should deny that motion. *See, e.g.*, *Butler v. Kroger Ltd. P'ship I*, 2020 WL 7483447, at *9 (E.D. Va. Nov. 30, 2020) (spoliator "should not be able to profit by securing summary judgment after depriving [the other party] of her best evidence that could have supported her claims").

Second, this Court should instruct the jury that there was video of both incidents, Goodman requested the video, and the VBSO did not preserve it, and that the jurors should not assume that the lack of corroborating objective evidence undermines Goodman's version of events. *See, e.g.*, *Muhammad*, 2016 WL 8116155, at *9 (ordering a similar instruction).

Third, this Court should preclude any testimony or evidence by Defendants that the video corroborated their version of events. *See, e.g.*, *Butler*, 2020 WL 7483447, at *9 ("It would be unfairly prejudicial to Butler to permit a Kroger employee to testify about matters supporting his employer's defense based solely on evidence its employer spoliated."); *Jenkins*, 2017 WL 362475,

at *18 (precluding "any evidence or argument that the contents of the video corroborated the Defendants' version of events").

Finally, this Court should award attorneys' fees and costs to Goodman for the expense of bringing this motion for sanctions. *See, e.g.*, *Jenkins*, 2017 WL 362475, at *18; *see Victor Stanley*, 269 F.R.D. at 536 (describing attorneys' fees and costs as "[l]ess severe sanctions").

## CONCLUSION

Goodman respectfully requests that if this Court finds that the VBSO acted intentionally, the Court sanction Defendants by instructing the jury either that they may or must presume the spoliated video evidence would have been unfavorable to Defendants and by awarding attorneys' fees and costs to Goodman.  In the alternative, Goodman respectfully requests that the Court sanction Defendants by denying any future motion for summary judgment; instructing the jury that there was video of both incidents, Goodman requested the video, and the VBSO did not preserve it, and that the jurors should not assume that the lack of corroborating objective evidence undermines Goodman's version of events; precluding any testimony or evidence by Defendants that the video corroborated their version of events; and awarding attorneys' fees and costs to Goodman.

Dated:  November 5, 2021                 Respectfully submitted,

/s/ Lauren C. Andrews
Philip A. Sechler (*pro hac* vice)
Lauren C. Andrews (VA Bar No. 92149)
ROBBINS, RUSSELL, ENGLERT, ORSECK
& UNTEREINER LLP
2000 K Street, N.W., 4th Floor
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
landrews@robbinsrussell.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2021, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the following:

Jeff Wayne Rosen
Jeffrey A. Hunn
PENDER & COWARD PC
222 Central Park Ave, Suite 400
Virginia Beach, VA 23462
Tel: (757) 490-6253
jrosen@pendercoward.com

*Counsel for Defendants*

/s/ Lauren C. Andrews
Lauren C. Andrews (VA Bar No. 92149)
ROBBINS, RUSSELL, ENGLERT,
ORSECK & UNTEREINER LLP
2000 K Street, N.W., 4th Floor
Washington, D.C. 20006
Tel: (202) 775-4500
Fax: (202) 775-4510
landrews@robbinsrussell.com

*Counsel for Plaintiff*