1          UNITED STATES DISTRICT COURT FOR THE
                EASTERN DISTRICT OF VIRGINIA
2                    ALEXANDRIA DIVISION
   _____
3
   DAVID GRAHAM GOODMAN,
4
                         Plaintiff,
5
   vs.
6                            Civil Action No.:  1:13cv540
7

8  KENNETH W. STOLLE, et al.,

9                        Defendants.
   _____
10

11   VIDEOCONFERENCE DEPOSITION OF DAVID GRAHAM GOODMAN

12                    October 12, 2021

13                      1:07 p.m.

14

15

16

17              HALASZ REPORTING & VIDEO

18         1011 East Main Street, Suite 100

19             Richmond, Virginia 23219

20                  (804)708-0025

21

22

23

24

25  REPORTED BY:  PAULA MARIE MADDERN, CCR

1       screen for you in front of you.

2              A     It's blown up now, sir.

3              Q     Yes, it's coming, one second.  All right.

4                    Mr. Goodman, in Interrogatory No. 12, we

5       ask you to list your injuries that you claim from the

6       incident that you've alleged in your complaint from

7       November 7 of 2012, and this is the answer that you

8       provided; do you see that?

9              A     Yes, sir.

10             Q     So if I understand correctly, you are

11      claiming that you injured your neck, your back, your

12      right shoulder and arm, your left hand, and then also

13      had some psychological suffering, including

14      post-traumatic stress disorder; is that correct?

15             A     That's correct, sir.

16             Q     Are you claiming any injuries in this

17      lawsuit to any other parts of your body other than

18      what is listed here as your neck, back, right

19      shoulder and arm, left hand, and psychological

20      suffering?

21             A     No, sir.  I mean, I've lost several teeth

22      that were loose after the incident, but that's

23      neither here nor there.  I'll just have the VA take

24      care of that for me.

25             Q     Are you claiming that the incidents that

1    occurred on November 7, 2012, made your teeth loose,

2    or in any other way caused you to lose your teeth?

3         A    I believe having my hand slammed into the

4    floor broke a couple of the roots, because I lost

5    them very shortly after that.

6         Q    When did you lose your teeth?

7         A    While I was still at the jail.

8         Q    Are you able to tell me whether it's days,

9    weeks, months, or years after the incident that

10   occurred on November 7th, 2012?

11        A    It would be in the weeks.  In probably no

12   more than a month, I lost, like, two teeth.

13        Q    Did any doctor or dentist tell you why you

14   lost those teeth?

15        A    No.  I was informed when I reached DOC

16   that he believed that they had been cracked.

17        Q    Who told you that?

18        A    One of the dentists when you come into

19   intake at any correctional center, you're

20   automatically screened, dental and physical.  I don't

21   remember which one.

22        Q    Do you remember which facility you were

23   at?

24        A    No, sir, I don't.

25        Q    Did any doctors or dentists look at or

1    treat your teeth while you were still at the

2    Chesapeake Correctional Center after November 7th,

3    2012?

4         A    No, sir.

5         Q    All right.  Let's go through this list, if

6    we can.  I'm going to start with the first one.  You

7    claim that you experienced or have had severe neck

8    pain since the November 7 incident, correct?

9         A    That's correct, sir.

10        Q    Have you ever, prior to November 7, 2012,

11   injured your neck?

12        A    Yes, sir, while in the Army.

13        Q    When did you injure your neck?

14        A    1983.

15        Q    How did you injure your neck in 1983?

16        A    There again, it was a fall, which later

17   required a cervical fusion.

18        Q    When did you have your cervical fusion?

19        A    I believe that was done in 2000 -- 2000 --

20   probably 2001, 2002.  I don't remember exactly, sir.

21        Q    After that first surgery to your neck in

22   either 2001 or 2002, have you had any new or

23   additional surgeries for your neck?

24        A    No, sir.

25        Q    Since the time of your neck surgery in

1  2001/2002 up until the time of this incident, you

2  were experiencing neck pain, correct?

3       A    Some.  Some degree of pain, yes, sir.

4  Nothing like I experience now.

5       Q    Well, if I read your medical records

6  correctly, prior to this incident, so between your

7  neck surgery in 2001/2002, and this incident in

8  November of 2012, you would have been given -- you

9  had tried steroids for your neck pain; is that right?

10      A    Multiple things, sir.  I don't even

11  remember all of them.

12      Q    Right.  And we're going to talk about that

13  here in a few minutes.  Let me ask you, since

14  November 7, 2012, have you had any new or additional

15  injury or trauma to your neck?

16      A    No.  No, sir.

17      Q    All right.  Looking at the second column

18  here under your answer or response to Interrogatory

19  No. 12, you're claiming that you experience severe

20  back pain as a result of the incident that occurred

21  on November 7th, 2012; is that right?

22      A    That's correct, sir.

23      Q    Had you ever injured your back prior to

24  November 7, 2012?

25      A    My lower back, yes, sir.

```
 1     it was right before -- that was before -- right
 2     before I was transferred to -- from the Chesapeake
 3     Correctional Center to the Hampton Roads Regional
 4     Jail.
 5          Q    You're right.  I can't read my --
 6          A    Once I went to there, they traded doctors.
 7          Q    Right, right.  I can't read my four versus
 8     nine, so I appreciate that.
 9               So the last time you saw Dr. Paul Mitchell
10     was in 2014, right?
11          A    I believe so, yes, sir.
12          Q    And did Dr. Paul Mitchell ever tell you
13     that he believed the conditions for which you were
14     treating with him for were caused by the November 7
15     incident?
16          A    He stated to me directly, he said he would
17     need another MRI, but that he believed there was
18     another depression in my spinal cord in my neck, and
19     that I probably needed more -- another cervical
20     fusion.
21          Q    All right.  One of the other doctors that
22     you saw was Dr. Tommy Osborne, an orthopaedic
23     surgeon.  Do you remember the last time you saw
24     Dr. Osborne?
25          A    There again, he did surgery, I believe it
```

1    was in 2013, on my left hand.  And he wanted to

2    review and see me again after they tried physical

3    therapy on my shoulder and cortisone injections, and

4    that didn't work.  So he was recommending that I have

5    an EMG and another MRI for my shoulder.

6        Q    And you never -- so the last time you saw

7    Dr. Osborne was in 2013, right?

8        A    I believe so.  It could have been as late

9    as 2014, I can't be sure.  I don't have my records in

10   front of me.  I do have an exact list that I believe

11   my lawyer has that I sent in that should give the

12   exact dates when I saw each doctor.

13       Q    Right, thank you.  But Dr. Osborne, you

14   never saw Dr. Osborne again after you were

15   transferred out to the other correctional center,

16   right?

17       A    No, sir.  Once I was transferred to

18   Hampton Roads Regional Jail, it was a completely

19   different set of doctors they use.

20       Q    And you were transported from the

21   Chesapeake Correctional Center to Hampton Roads

22   Regional Jail on July 25th, 2014, according to the

23   record; does that sound right?

24       A    That sounds correct, yes, sir.

25       Q    And so you never saw Dr. Mitchell or

1    treatment?

2         A    He refused to give me anything for the

3    pain, yes.  To be -- to medicate me for the MRI, yes.

4         Q    How did that make you feel?

5         A    I wasn't happy at all.  I'm trying to get

6    some relief.  But there again, you know, I'm in their

7    custody, there's nothing I can do about it.

8         Q    Have you seen any doctors outside of the

9    Department of Corrections' doctors since 2019; in

10   other words, over the last year and a half, two

11   years?

12        A    No.  We've been under COVID lockdown and

13   this and that, and basically nothing happens.  And at

14   this point, I'm receiving Tylenol, and I don't know,

15   some other pill that as far as I know, it's for

16   arthritis, and it does absolutely nothing for the

17   pain.

18        Q    Have you explained that to the doctors

19   that you're currently under the care of?

20        A    Yes.

21        Q    And what do they tell you about that?

22        A    But due to the area that I'm locked up in,

23   this is considered an opioid area, and I can't get

24   anything.

25        Q    Is that what a doctors --

```
 1        A    When I was at any correctional -- excuse
 2   me.  When I was at other correctional facilities, I
 3   could receive medication.  Here, I'm not allowed to
 4   get it.
 5        Q    Have you filed a grievance or a complaint
 6   for that?
 7        A    I filed a complaint and that was answered,
 8   oh, you're in an opioid zone.  Other people's
 9   addiction to opioids has nothing to do with my care,
10   though, as far as I'm concerned.  I'm not somebody
11   who's taking it just so I can get high.
12        Q    Right.  And so you're not happy with the
13   care or the treatment or the medicines that they're
14   providing you currently, are you?
15        A    Well, no, I'm not happy, no.
16        Q    Right.  In fact, you're angry at that,
17   right?
18             MS. ANDREWS:  Object to form.
19        A    Well, I wouldn't say angry.  I'm upset
20   about it.
21        Q    Has any doctor that you've seen since
22   November 7th, 2012, told you that they believe you
23   suffered a permanent injury and will always
24   experience pain or problems with the portions of your
25   body that you claim were injured in this incident?
```

```
 1    a breath between it.  Let me ask some questions and
 2    then you can answer, okay?
 3          A    Yes, sir.
 4          Q    What do you mean you were "drug into
 5    holding cell"?
 6          A    Sergeant Hayes grabbed me by the collar of
 7    the jumpsuit, dragged me off the bench, slammed me
 8    into the concrete wall, and slammed me into the back
 9    of the holding cell and left me in the floor, because
10    he told me get up and go to the holding cell.  And I
11    told him I can't walk without my cane and that upset
12    him.
13          Q    All right.  How far was it from the bench
14    that you were sitting on in the intake area to the
15    holding cell?
16          A    Around the wall and into the holding cell,
17    probably 25 feet, maybe.
18          Q    Right.  Had you --
19          A    But it was the degree of force
20    (indiscernible).
21               COURT REPORTER:  I'm sorry?
22          Q    Did you use a cane to walk to the
23    courthouse that day?
24
25               (Court reporter asked for clarification.)
```

1

2      A     The remainder of that sentence was it was

3   the degree of force that was used.  I was literally

4   snatched from the bench to the floor and slammed into

5   a concrete wall.

6      Q     All right.  Mr. Goodman, you mentioned

7   that you told the deputy that you could not walk

8   because you didn't have your cane, right?

9      A     That's correct.

10     Q     Did you ever have a cane while you were at

11  the Virginia Beach Correctional Center?

12     A     I came to the correctional center with my

13  cane and was placed into a wheelchair and had my cane

14  then too.

15     Q     Where was the wheelchair when you said to

16  the deputy you can't walk to the holding cell because

17  you didn't have your cane?

18     A     It wasn't visible to me.  I don't know.

19     Q     So the deputy lifted you off of the bench;

20  is that what you're telling me?

21     A     No.  He drug me from the bench.

22     Q     Okay.  And when you say he drug you 25

23  feet from the bench into the holding cell, are you

24  telling me that he was dragging you and you were on

25  the floor?

```
 1        A     That's correct.

 2        Q     You could not walk at all?

 3        A     No, sir.

 4        Q     Did you --

 5        A     I wasn't given an opportunity to even --

 6   excuse me, go ahead.

 7        Q     Did you ever try to walk?

 8        A     I wasn't given the opportunity.  I was

 9   dragged from the bench with force like he was

10   throwing a wheelbarrow across the yard.

11        Q     Was there anybody else with him at the

12   time?

13        A     No.

14        Q     Could you see any other sheriff's deputies

15   in the area, the intake area where you were located?

16        A     To be honest, I wasn't looking.

17        Q     Did you --

18        A     I went completely limp so --

19        Q     Did you just say you went completely limp?

20        A     Yes, sir.  I went completely --

21        Q     Why --

22        A     -- limp so I wouldn't have the hell beat

23   out of me.

24        Q     So you made a conscious decision to go

25   limp when he -- when you say he dragged you from the
```

1    bench to the holding cell; is that right?

2        A    When I was snatched off the bench into the

3    floor, I made the conscious decision to go limp so I

4    wouldn't get hurt any worse.

5        Q    And then you (audio difficulty) --

6            MS. ANDREWS:  Jeff, we're losing your

7    audio.

8            COURT REPORTER:  Jeff?

9            MR. HUNN:  Hold on one second.

10           COURT REPORTER:  We're losing your audio

11   again.

12           (Off the record to address technical

13   difficulties.)

14

15   BY MR. HUNN:  (continuing)

16       Q    Mr. Goodman, did Deputy Hayes ask you to

17   stand up from the bench?

18       A    No.

19       Q    Did he ask you -- did Deputy Hayes ask you

20   to get off the bench twice before he touched you?

21       A    No.  If I could elaborate, as I said, he

22   grabbed me by the collar with force and slammed me

23   into the floor.  Now, I'm not going to change that

24   story, that's the way it happened.

25       Q    Before he had to put his hands on you, did

```
 1   he ask you to get up from the bench so he could take
 2   you to your housing assignment?
 3        A    As I said, the one time he asked me to
 4   stand up, that we were going to 2C Medical on the
 5   floor and I said no, that was the last time we had a
 6   conversation.
 7        Q    So when he said get up, we're going to
 8   housing, 2C Med, you did not comply with his verbal
 9   instructions to go, did you?
10        A    No, sir.  Let's not change this.  I said
11   no to on the floor.
12        Q    Right.  Well, when you said no, did you
13   then get up?
14        A    No, sir.
15        Q    All right.  So when the deputy told you
16   that you were going to the housing assignment, you
17   did not comply and get off the bench, did you?
18        A    No, sir.
19             MS. ANDREWS:  Object to form.
20        Q    All right.  Mr. Goodman, the last sentence
21   of this third paragraph of your statement, you said,
22   "Then shift change still no food-no meds," right?
23        A    Yes, sir.  I believe that's correct.  I
24   believe it was then shift change, because I saw so
25   many deputies going back and forth.
```

1      Q    Right.  But why did you a write no food,

2  no --

3      A    Because I had been there all day --

4

5           (Unreportable crosstalk, court reporter

6  asked for clarification.)

7

8  BY MR. HUNN:  (continuing)

9      Q    All right.  We'll start over.

10          Mr. Goodman, you wrote "no food-no meds,"

11  right?

12     A    That's correct.

13     Q    And so you were upset that you had not

14  received food or meds and that you had been there all

15  day, right?

16     A    Since about three o'clock in the morning,

17  yes, sir.

18     Q    And then going on to the next paragraph,

19  it says, "Finally Sergeant," and can you read for me

20  the rest of that sentence?

21     A    Yes, sir, Sergeant Roland.

22     Q    All right.  "(Intake) said going to

23  another place.  No problem on way down hall.  Passed

24  out?  No food?  Pain-unknown?  In severe

25  pain-wheelchair seat-sitting on stool."

```
 1        A    Steel.

 2        Q    Steel.  Is that what you wrote?

 3        A    Yes, sir.

 4        Q    Let me just see if I can understand what

 5   it is you're saying here.  So finally Sergeant Roland

 6   in intake said you were going to another place.  Did

 7   he tell you where you were going?

 8        A    To another medical, that's all I knew.

 9   But I knew Sergeant Roland from the past.

10        Q    Okay.  How did you --

11        A    He was then just a deputy.  From 2003, but

12   he was just a deputy then.

13        Q    All right.  Then you write, "No problem on

14   way down hall, passed out," question mark.  What do

15   you mean there?

16        A    In other words, I'm stating that I don't

17   know how I was dislodged from the chair.

18        Q    So it's possible that you passed out; is

19   that what you're saying?

20        A    Anything's possible, but I don't know.  It

21   happened so quickly I have not a clue.  To this day I

22   don't have a clue.

23        Q    How did Sergeant Roland take you from

24   where you were going toward the next assignment?

25        A    Well, let's back up just a second, because
```

1    there's -- there's, like, a piece missing here.

2              Sergeant Roland came to the holding cell,

3    helped me out of the floor and helped me into the

4    wheelchair; that's when the other three deputies

5    became involved.

6         Q    All right.  And so four deputies were then

7    taking you down to the next cell assignment?

8         A    No, there was three.  There was Corporal

9    Moisett, Deputy Repass, and Deputy -- I believe his

10   name's Diggs.  Yes, Diggs.

11        Q    And they were -- you were being pushed in

12   a wheelchair, correct?

13        A    That's correct.

14        Q    All right.  And then at some point you

15   were not in your wheelchair any longer; is that

16   right?

17        A    That's correct.

18        Q    Do you know why you were not in your

19   wheelchair any longer?

20        A    No, sir.  That's the reason I wrote as I

21   did, "On the way down hall, passed out," comma or

22   dash or question mark or "no food, pain."  It's all

23   unknown to me.  All I know is all of a sudden, I was

24   in the floor.

25        Q    All right.  And --

1        A      I mean, I know from experience --

2        Q      Go ahead and finish.

3        A      I was going to say, I know from experience

4    it only takes, like, a minute piece of gravel or

5    anything to lock these wheels up.  I've been dumped

6    out this one mistakenly just by a piece of dirt in

7    the floor.

8        Q      All right.  So you're wheeling down the

9    hall in your wheelchair, and at some point you end up

10   not in the wheelchair.  When did you realize you

11   weren't in the wheelchair?

12       A      Like I say, it just happened, it was so

13   quick.  And the deputies were on me like I was trying

14   to escape or something.

15       Q      And what do you mean by that?  What did

16   they do once you were not in the wheelchair?

17       A      Well, let's see, I had one standing on my

18   back, one had their knee in my ribs, another one's

19   rib [sic] in my hands behind my back trying to rip

20   them out of the socket.

21       Q      Anything else?

22       A      No, that's about it for that part.

23       Q      Did you purposefully get out of the

24   wheelchair?

25       A      No, sir.

1          Q     Do you know how long you were out of the
2    wheelchair before the deputies placed their hands on
3    you?
4          A     Yeah, about two seconds.
5          Q     Once the deputies placed their hands on
6    you, what happened next?
7          A     Nothing.  I was pinned to the floor.
8          Q     What did they do from that point forward?
9          A     Well, let's see.  After handcuffing me, I
10   had -- one of them was cussing me, I'm not sure which
11   one that was.  I believe that was Moisett.  I believe
12   Deputy Diggs was on my right-hand side, Corporal
13   Moisett on my left, and they were grabbing my
14   forearms and my wrists and dragging them up over top
15   of my -- the center of my back, dragging -- basically
16   dragging me down the hallway.  Because I told them, I
17   said, "I can't walk like this."  And they just kept
18   continuing to put more force on my shoulders, so it
19   was either hit the floor or drag my feet, one of the
20   two.
21         Q     Did you ever get back into the wheelchair?
22         A     No.
23         Q     Did you --
24         A     The wheelchair wasn't offered to me.
25         Q     Did you ask the deputies to place you back

1    in the wheelchair?

2         A    Yes, I did.  And I was told F-U.

3         Q    How far was it from where you were not in

4    the wheelchair for any longer until the (audio

5    difficulty).

6              COURT REPORTER:  Until the what?

7              MR. HUNN:  Until the cell that they

8    brought him to.

9              COURT REPORTER:  Your audio was dropping.

10             THE WITNESS:  Yeah.

11   BY MR. HUNN:  (continuing)

12        Q    Let me ask you and see if you understand

13   this.

14             So from the point where you were no longer

15   in the wheelchair until the cell the deputies brought

16   you to, can you tell me how far in distance that is?

17        A    I believe I said a hundred feet or more.

18        Q    Did you do the same thing that you did

19   before and purposely go limp at that point?

20        A    No, sir.  I didn't have that option.  It

21   was either try to walk as best I could or have my

22   shoulders ripped out of the socket.

23        Q    When you were out of the wheelchair, did

24   any of the deputies instruct you to get back into the

25   wheelchair?

1       A      No.

2       Q      What, if anything, did the deputies say to

3  you from the point they picked you up after you were

4  in the wheelchair until you got to the cell?

5       A      Nobody was talking to me.  One of them was

6  talking to the female, Repass.

7       Q      What did they say?

8       A      I don't have a clue.  Wasn't any of my

9  business, I wasn't really listening.

10      Q      So you had no conversations with any of

11  the deputies from the time that you fell out of the

12  wheelchair until you were placed in the next cell?

13      A      Until I was displaced from the wheelchair.

14  I don't know how I got out of it.

15      Q      Well, as you said earlier, you may have

16  passed out because you didn't have any food, right?

17      A      Anything's possible, but I'm not going to

18  say that I jumped or this or that, so I'm not going

19  to go there.

20      Q      Right.  They did not take you, they being

21  the deputies, did not take you out of the wheelchair,

22  did they?

23      A      I don't have a clue.  I could have been

24  dumped out.  To the best of my knowledge, I don't

25  know.

```
 1          Q     You have no --
 2          A     -- it all happened so fast I don't have a
 3    clue.
 4          Q     -- idea -- all right, thank you, sir.
 5                What did the deputies -- so just describe
 6    for me what the deputies did between the -- when you
 7    went out of the wheelchair until they got you back
 8    into the other cell?
 9          A     Well, as I said, I was basically dragged
10    down the hallway, cursed.  And then when I got to the
11    isolation -- medical isolation cell, it was a
12    concrete floor with a toilet in the back of it built
13    into the wall, and I was slammed into the floor.  And
14    then the female stood on my hand to the point where
15    she crushed it.  Somebody's foot was in the center of
16    my back.  And then there was a knee on my neck and my
17    neck snapped and I lost consciousness.
18          Q     How long were you out of consciousness?
19          A     I don't know.  The witness that saw it,
20    Brandon Coburn, could probably give you a better idea
21    than I could.
22          Q     When's the last time you talked to Mr.
23    Coburn?
24          A     I haven't spoken to him since the night at
25    the Chesapeake jail, or the Virginia Beach jail,
```

1    rather.

2          Q    Do you know where Mr. Coburn is located?

3          A    Not right offhand.

4          Q    What's the next thing you remember after

5    you lost consciousness?

6          A    That he was speaking to me, asking me if I

7    was all right, and I was laying in the floor in the

8    corner.  And apparently a CO -- or excuse me -- a

9    deputy was making the rounds, and he called out to

10   him.  And he called a code, which was, in turn, they

11   took me to medical.

12         Q    So is it your testimony that three

13   deputies from the Virginia Beach Sheriff's Office

14   left you unconscious in a cell and closed the door

15   and left?

16         A    That's correct.

17         Q    And you don't know how much time elapsed

18   between the time you went unconscious and until you

19   woke up, right?

20         A    According to Mr. Coburn, I laid there

21   approximately 30 minutes, but neither one of us had a

22   watch.

23         Q    Was Mr. Coburn in the cell with you, or in

24   a neighboring cell?

25         A    No.  He was in the cell directly in front