

# Transcript of **Curtis Hayes**

Thursday, September 9, 2021

*David Graham Goodman v. Kenneth W. Stolle, et al.*

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO (800.367.3376)
Scheduling@Trustpoint.One

Reference Number: 107452

```
 1      Q.    Did he just stay on the floor?
 2      A.    Yes.
 3      Q.    Did he say anything to you at that point?
 4      A.    I don't recall.
 5      Q.    You just don't remember one way or another
 6  if he said anything to you at that point?
 7      A.    I don't recall.
 8      Q.    So what happened next?
 9      A.    At that point, I grabbed Mr. Goodman under
10  his armpits from behind him, I stepped behind him
11  towards his head area, I grabbed him under his
12  armpits and began to slide him into a cell that was
13  nearby to secure him.
14      Q.    Is that one of the cells that was there in
15  the intake area?
16      A.    Yes.
17      Q.    What do you mean by slide him?
18      A.    Slid him across the floor because he
19  wouldn't stand up.  And the safest means to get him
20  into a cell was to grab him under his armpits from
21  behind, almost like a rescue pull, and I slid him
22  into a cell that was next to him on the floor.
```

```
 1      Q.   Did you pull him across the floor, or did
 2 you push him across the floor?
 3      A.   I pulled him across the floor.
 4      Q.   And you were holding him under his armpits
 5 while you were doing that; is that right?
 6      A.   Yes.
 7      Q.   Did you grab him anywhere else while you
 8 were pulling him?
 9      A.   No.  Under each armpit behind him, and
10 slightly lifted up off the floor, and was able to
11 pulled him across the floor.
12      Q.   Why did you take him to that cell?
13      A.   For a number of reasons.  The first reason
14 is because he was not compliant with us in going to
15 his housing assignment; he was being verbally abusive
16 and noncompliant.  Secondly is because we have to
17 have people secured in the jail.  You can't just have
18 inmates -- we're not going to leave an inmate right
19 there laying on the floor because they want to not
20 comply.  So we have to secure them in a cell.  That
21 was what we did, what I did.
22      Q.   Did you call for backup at any point
```

```
 1      Q.   What part of the intake area did this
 2  cameras cover?
 3      A.   There's several different cameras, and
 4  they cover essentially I'd say the vast majority of
 5  the intake area.  Almost every corner of the intake
 6  area there is a camera that covers it.
 7      Q.   Are there any parts of the intake area
 8  that aren't covered by cameras?
 9      A.   I don't know.
10      Q.   Did the security cameras in the intake
11  area capture any footage of this incident with
12  Mr. Goodman?
13      A.   Yes.
14      Q.   How do you know that?
15      A.   If I can reflect back on my incident
16  report, I would tell you.
17      Q.   And we can look at that a little later.
18  But without looking at that, do you remember being
19  aware that there was security camera footage?
20      A.   If I wrote it down in my incident report,
21  if I typed it in my incident report, then there was.
22      Q.   Did you view that security footage?
```

```
 1      A.    Yes.
 2      Q.    When did you view it?
 3      A.    The day of the incident report.
 4      Q.    Did you view it before you submitted your
 5   incident report?
 6      A.    Yes.
 7      Q.    How soon after the incident did you view
 8   the video footage?
 9      A.    I don't recall.
10      Q.    You said you were going off shift at 6:00,
11   right?
12      A.    6:00 p.m., yes.
13      Q.    Did you leave the jail when your shift
14   ended at 6:00 p.m.?
15      A.    As far as I can recall, yes, I did.
16      Q.    So did you view the video footage and
17   write your incident report before you left for the
18   day at 6:00 p.m.?
19      A.    To the best of my recollection, yes, I
20   did.
21      Q.    What did the video footage show?
22      A.    It showed the incident.
```

1   Q.   Did it show the entire incident from start
2   to finish?
3   A.   Yes.
4   Q.   Was it all on one camera or multiple
5   cameras?
6   A.   I'd have to reflect back on my incident
7   report.  I don't recall.
8   Q.   And it showed the incident as you've
9   described it here today, right?
10  A.   That's correct.
11  Q.   I know you said that it covered the whole
12  incident from start to finish, but I just want to
13  make sure that we've got this clear.
14       MR. ROSEN:  I object.  You've asked about
15  the report, you haven't shown it to him.  Object to
16  the form of the question.
17       MS. ANDREWS:  I'm not asking him about the
18  incident report.  I'm asking him about the video
19  footage.
20       MR. ROSEN:  Okay, got it.  Sorry.
21  BY MS. ANDREWS:
22  Q.   So, Deputy Hayes, did the video footage

```
 1   capture the part of the incident where Mr. Goodman

 2   refused to get in the wheelchair?

 3        A.   Yes.

 4        Q.   Did it show him refusing to comply with

 5   your orders?

 6        A.   It showed the entire thing.

 7        Q.   And so just to be clear, it showed him

 8   dropping onto the floor?

 9        A.   It showed the entire thing.

10        Q.   And it showed you pulling him across the

11   floor into the cell?

12        A.   It showed the entire incident.

13        Q.   And did it show you and Mr. Goodman once

14   you had him inside the cell?

15        A.   It showed -- there's not a camera inside

16   the cell, it's in the main part of the intake area.

17   It does show the cell from the outside.  As I recall,

18   there's no cell -- excuse me -- cameras inside the

19   cell.  So it would have shown me closing the door and

20   Mr. Goodman secured in the cell.

21        Q.   Would that camera that's outside the cell

22   be able to show what happened inside the cell?
```

1    A.    No.

2    Q.    Did anyone view the video footage with you
3  that day?

4    A.    I don't recall.

5    Q.    Was that the only time that you viewed the
6  video footage?

7    A.    Yes.

8    Q.    How did you come to view the video footage
9  that day?

10   A.    Go to an area where you can pull it up on
11  a camera -- excuse me, on a computer on -- you can
12  pull a camera up on a computer and it will show the
13  time-lapsed incident.  It shows the video, it doesn't
14  show audio.  It only shows video.

15   Q.    Is that because the cameras don't capture
16  audio?

17   A.    Correct, the cameras are strictly for
18  video, is my understanding.

19   Q.    And when you pull up that video footage on
20  the computer, is that something you can do on your
21  own, or do you have to request that from somebody?

22   A.    Our normal procedure is we sit down with a

```
 1      A.    No.
 2      Q.    Do you know who Captain Linda Richie is?
 3      A.    Yes.
 4      Q.    Who is she?
 5      A.    She's a captain with the Sheriff's Office.
 6  I don't know her exact title.  I believe she deals
 7  with investigations, maybe.  I don't know, but I know
 8  she's a captain with the Sheriff's Office.
 9      Q.    Have you talked to her about this lawsuit?
10      A.    During this process leading up to this
11  point, I've had to go into her office and have
12  paperwork notarized; and I've been notified of when I
13  was supposed to speak to attorneys or if Mr. Rosen
14  will speak to me, and that's pretty much it.
15      Q.    Have you talked with Captain Richie about
16  the video footage of the incident?
17      A.    I don't know if I've necessarily talked to
18  her.  I think we both are aware that the video
19  footage no longer exists.
20      Q.    Why do you say that?
21      A.    It's pretty common knowledge, you know,
22  for all of us that are involved in this.
```