

# Transcript of **Linda Richie**

Wednesday, September 8, 2021

*David Graham Goodman v. Kenneth W. Stolle, et al.*

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO (800.367.3376)
Scheduling@Trustpoint.One

Reference Number: 107449

```
 1  BY MS. ANDREWS:
 2      Q.   I would like to draw your attention to the
 3  end of that block of text that starts with the word
 4  "explanation."  The last couple of sentences, it
 5  says, "DVR313 camera 12, 13, and 14."  Do you see
 6  that?
 7      A.   Yes.
 8      Q.   What does that refer to?
 9      A.   That refers to our camera system in the
10  jail.  It's a digital video recording system within
11  the jail.  And those are the specific cameras that
12  were reviewed.
13      Q.   So what is DVR313 mean?
14      A.   Every set of cameras are tied to a
15  specific DVR.  DVR313 was the DVR system specific to
16  the area for which this incident would have been
17  visual.
18      Q.   And do you know what area of the
19  correctional center that is?
20      A.   This would be the intake area.
21      Q.   Okay.  And cameras 12, 13, and 14, that
22  refers to three different cameras?
```

 1    A.    Yes, ma'am, linked to that DVR system.

 2    Q.    Are there other cameras linked to that DVR
 3  system?

 4    A.    There are other cameras linked to that.  I
 5  don't know the specific numbers without -- at the
 6  time, without having that pulled up.

 7    Q.    And do you know what part of the
 8  correctional center each of those three cameras
 9  listed here would have captured?

10    A.    Off the top of my head, no.

11    Q.    Do they all capture part of the intake
12  area?

13    A.    Yes, specific parts of the intake area.
14  Wherever each camera is would be assigned a certain
15  area.

16    Q.    Are the cameras totally stationary or can
17  they be moved throughout the day, or while an
18  incident is happening?

19    A.    No, these cameras are stationary and in
20  fixed position.

21    Q.    Do they capture sound?

22    A.    No.

1   Q.   And is the video that they capture in
2   black and white or color?
3   A.   It's in black and white.  I believe it was
4   in black and white at the time.  I believe it's in
5   color now.  We have a new camera system.
6   Q.   So it may have been in black and white
7   back in 2012?
8   A.   Correct.
9   Q.   Okay.  So what is the process that happens
10  when a use of force incident is captured on camera at
11  the Virginia Beach Correctional Center?
12        MR. ROSEN:  At the time of the incident,
13  is your question?
14        MS. ANDREWS:  Yes, just to clarify it,
15  back in November of 2021.
16        MR. ROSEN:  Okay.  You can answer that
17  question.
18        THE WITNESS:  Okay.  Any time there was an
19  incident report written, whether it's use of force or
20  otherwise, the immediate supervisors will review that
21  incident, both the report and the cameras.  And those
22  cameras are notated in the incident report.

1    At the time, I was the commanding officer
2 of internal affairs.  We refer to it as professional
3 standards or PSO.  All incident reports would get
4 emailed to the professional standards office.  And
5 all incident reports would be reviewed on camera for
6 any violations of policies, or whether it was a use
7 of force, to ensure that all training tactics were
8 used.  That was normal procedure.
9    The incident report would then be
10 forwarded through the chain of command to the chief
11 deputy for review, also.  And then that would be
12 laserfiched as a part of a permanent record after
13 that.
14 BY MS. ANDREWS:
15    Q.   Okay.  So going back to something you said
16 at the beginning of your answer.  You said that when
17 there's a use of force incident, the immediate
18 supervisors review any video footage.  Would that be
19 the immediate supervisors of whoever was involved in
20 the use of force incident?
21    A.   And their chain of command.  So their
22 lieutenant, their captain.  Maybe not the ones

1  long it stays on the DVR.  We have found that,

2  typically, it lasts for about 30 days if we don't

3  download from that DVR, and save it to an alternative

4  media system, such as a CD or a DVD.

5  BY MS. ANDREWS:

6     Q.   And under what circumstances would you

7  download video footage to an alternative media

8  system?

9          MR. ROSEN:  At the time of the incident?

10 BY MS. ANDREWS:

11    Q.   At the time of the incident.

12    A.   There would be several circumstances.  If

13 we had a complaint, if we anticipated possible

14 litigation, if there was a violation of policy or

15 procedures, if we received a subpoena or any type of

16 request for that video from an outside source, within

17 the timeframe that it was still available, we would

18 have downloaded it, and preserved it.

19    Q.   Okay.  So I want to take you to those in

20 turn.  So the first circumstance you said is when

21 there's a complaint.

22    A.   Correct.

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1    Q.    What do you mean by complaint?

2    A.    Complaint being an individual states that
3  there was a complaint of a use or force or a
4  complaint of missing property. Anything that someone
5  that was in our facility would have complained about,
6  we would have preserved the video. If I received a
7  complaint, like, from the police department or a
8  request from the police department, based on the
9  behavior of the individual, we would have preserved
10 the video.

11   Q.    So if an inmate complains that there was a
12 use of force, for instance, how would the inmate make
13 that complaint back in 2012?

14   A.    There are a couple of ways. They can
15 complain to a supervisor making rounds. We do shift
16 change every 12 hours. They are required at the time
17 to do rounds through the facilities, so they could
18 complain to the supervisor. They could write an
19 inmate in-house request form, send it directly to
20 internal affairs, and file a complaint. Sometimes
21 they have their family call in to the internal
22 affairs directly, and file a complaint for them.

```
 1        Q.    How about if they tell medical staff -- if
 2   the inmate tells medical staff that they have a
 3   complaint?
 4        A.    If they tell medical staff, then the
 5   medical staff can notify us that there is a
 6   complaint.
 7        Q.    And you say that medical staff can notify
 8   you.
 9        A.    Yes.
10        Q.    Are they required to notify you?
11        A.    Yes.  Yes.
12        Q.    And I'm saying you, but who is it that
13   medical staff would be required to notify if they
14   received a complaint from an inmate?
15        A.    There were two options at that time.  We
16   have a medical liaison supervisor that they could
17   have notified that works directly with the sheriff's
18   department and medical, or they could have contacted
19   internal affairs or PSO, as we call it, and notified
20   us.
21        Q.    Okay.  The second circumstance that you
22   mentioned for when video would be downloaded off of
```

1  no further action was required based on this incident
2  report?
3      A.   I cannot answer that question for the
4  supervisors.
5      Q.   Okay.  And so was this video footage
6  downloaded off of the DVR?
7      A.   No.
8      Q.   Was it automatically overwritten?
9      A.   Yes.
10     Q.   Do you know if Deputy Hayes was informed
11 that it was automatically overwritten?
12     A.   No.
13     Q.   So was there any investigation by the
14 Virginia Beach Sheriff's Office of this incident
15 between Mr. Goodman and Deputy Hayes, beyond whatever
16 review took place that Lieutenant Harvey and Captain
17 Harris signed off on?
18         MR. ROSEN:  Object to the form of the
19 question.  You can answer.
20         THE WITNESS:  The internal affairs or PSO
21 office reviews all video and incident reports.  No
22 formal investigation was opened.

```
 1  BY MS. ANDREWS:
 2      Q.    So what's the difference between that
 3  review by the PSO that you just described and what
 4  you called a formal investigation?
 5      A.    We would review the incident report.  We
 6  would watch the video.  We would look for any
 7  violations of policy or procedures, any requirements
 8  needed that we noticed in use of force training or
 9  any other type of training, depending on the
10  incident.  And we would initiate an investigation if
11  we found reason to have to do that.  We would have
12  downloaded the video, and opened a formal
13  investigation.
14      Q.    So what would be reason to have to
15  initiate an investigation?
16      A.    A violation of policy and procedures, a
17  training concern.  Anything that we noticed that may
18  need to be addressed.  It wouldn't specifically
19  involve the use of force.  It could involve any type
20  of incident.
21      Q.    Would you initiate an investigation into a
22  use of force incident if you got an inmate complaint
```

1  about it?

2      A.   Yes.

3      Q.   And that would be what you called a formal
4  investigation?

5      A.   Yes.

6      Q.   On this incident report from Deputy Hayes,
7  near the bottom, where it says, "investigation
8  requested," and then it says, no.  The box for no is
9  checked.  Do you see that?

10     A.   Yes.

11     Q.   Do you know who would have been
12 responsible for making that determination?

13     A.   Initially?  Lieutenant Harvey and Captain
14 Harris.

15     Q.   And what about after that?

16     A.   Then it would have gone through to the
17 chief deputy, which would be Mark Shuster.  And
18 that's from that side of the chain going up.  Again,
19 internal affairs looked at it separately.

20     Q.   So maybe you can clarify that for me a
21 little bit.  Are there two processes going on here?

22     A.   Absolutely.  There's a secondary check and

1  balance system.  That would be internal affairs.  So
2  the incident report, the actual written original
3  report would start at the -- whoever is involved in
4  the incident.  And then go up through the chain of
5  command.
6         Once it gets submitted at the end of their
7  shift, it gets submitted to internal affairs
8  automatically at the end of their shift.  And
9  internal affairs would review all incident reports
10 and any video footage that was available to go with
11 those incident reports.  So you have two separate
12 reviewing systems going on at the same time.
13     Q.   So when internal affairs reviews the
14 incident report form, is that the version of this
15 form that has Lieutenant Harvey and Captain Harris's
16 signatures on it, or would it be an earlier version
17 of that?
18     A.   It would have been an earlier version of
19 that.  It would have been the version submitted at
20 the end of that shift, an electronic version
21 submitted at the end of the shift.
22     Q.   So who are the people -- and I don't

```
 1     A.     Yes, first-line supervisor.

 2     Q.     Sorry, say that again?

 3     A.     First-line supervisor.

 4     Q.     So what would his role as Deputy Repass's

 5  first-line supervisor have been in reviewing this

 6  incident?

 7            MR. ROSEN:  Objection to the form of the

 8  question, asked and answered.  You can answer it

 9  again.

10            THE WITNESS:  His role would have been to

11  review the report, and review the video, and ensure

12  that everything was accurate.  If there were any

13  concerns or issues, his role would have been to

14  address them at the time, and notify his immediate

15  supervisor, and ensure that this report is accurate

16  and went up to his next chain of command.

17  BY MS. ANDREWS:

18     Q.     And is that the case even though Corporal

19  Moissett was involved in the use of force incident

20  that's described in this incident report?

21     A.     Yes.

22     Q.     So would he have been reviewing his own
```

1  actions?

2     A.    Absolutely.  He would have reviewed the
3  video and the report, to ensure that it was accurate,
4  based off of what was stated in the report.

5     Q.    So when this sentence goes on to say that
6  "the cameras were reviewed by all parties involved,
7  and are consistent with this report," who determined
8  that the cameras were consistent with this report?

9           MR. ROSEN:  Object to the form of the
10  question, lack of foundation.  You can answer that.

11          THE WITNESS:  I cannot answer for all the
12  other supervisors.  I can answer that at the time, in
13  internal affairs, it was our responsibility to review
14  the report and the cameras, and ensure that they were
15  accurate.  And there were, again, no violations,
16  training issues.

17  BY MS. ANDREWS:

18     Q.    Okay.  And do you know if the video
19  footage on these cameras was downloaded off of the
20  DVR and preserved?

21     A.    It was not.

22     Q.    It was automatically overwritten?

1    A.    Yes.

2    Q.    Do you know if Deputy Repass was informed
3  about the fact that the video footage was
4  overwritten?

5    A.    No.  I don't know.

6    Q.    You don't know or that she was not
7  informed?

8    A.    I don't know.

9    Q.    I may be wrapping up.  Can we take another
10 five-minute break, just so I can make sure that there
11 isn't anything else that we need to cover?

12        THE WITNESS:  Sure.

13        MR. ROSEN:  Sure.  No problem.

14        (Recess.)

15 BY MS. ANDREWS:

16   Q.    So you said that internal affairs or
17 PSO -- are those terms interchangeable to you?

18   A.    Yes.

19   Q.    So you said that internal affairs would
20 have reviewed this incident with Deputy Repass and
21 Mr. Goodman, correct?

22   A.    Correct.

```
 1        Q.    Do you know what the outcome of that
 2   review was?
 3        A.    We did not open a formal investigation.
 4        Q.    Was there any other determination made,
 5   other than not opening a formal investigation?
 6        A.    No.  If there were any violations in
 7   policy or training, we would have opened a formal
 8   investigation.
 9        Q.    So did internal affairs determine that
10   there were no violations of policy or training?
11        A.    Correct.
12        Q.    And is that conclusion documented
13   anywhere?
14        A.    Other than our practice, no.
15        Q.    What do you mean by your practice?
16        A.    Other than that was our daily practice, to
17   review all incident reports and/or video recordings.
18        Q.    And how about for the incident with
19   Mr. Goodman and Deputy Hayes, internal affairs
20   reviewed that as well; is that right?
21        A.    Correct.
22        Q.    And did internal affairs determine that no
```

 1     A.    "Inmate stated he was upset and expressed
 2  his interest in viewing the videos for a lawsuit
 3  against those involved in this incident."
 4     Q.    Was the internal affairs office made aware
 5  of this request that the inmate made?
 6     A.    Not to my knowledge.
 7     Q.    And I think you said before that medical
 8  staff are required to notify someone if an inmate
 9  makes a complaint?
10     A.    Correct.
11     Q.    So would this -- do you know who Nurse
12  Courtney Hoyles is?
13     A.    I don't know her myself, off the top of my
14  head.  I may recognize her if I saw her face again.
15     Q.    So do you know if she notified anyone in
16  the sheriff's office about this complaint that
17  Mr. Goodman made?
18           MR. ROSEN:  Object to the form of the
19  question, asked and answered.  Go ahead and answer it
20  again.
21           THE WITNESS:  No, I don't know.
22           MS. ANDREWS:  I don't think I have

Trustpoint.One  Alderson
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1    Q.   Do you remember if you received a
2    litigation hold at all, whether it was before or
3    after you got notice of the lawsuit?
4    A.   I don't believe so.  Again, if I did, it
5    would be in the legal paperwork that we submitted to
6    Jeff, but I do not believe we received a lit. hold on
7    this.  I just believe I received notification of the
8    lawsuit.
9         MS. ANDREWS:  Okay.  That's all I have.
10   Thank you for your time.
11        MR. ROSEN:  I guess we'll read to ensure
12   it's been transcribed accurately by the court
13   reporter.  You know, we'll read it.
14        (Discussion off the record.)
15        MR. ROSEN:  Then I'd like an electronic
16   copy, please.
17        (Whereupon, at 11:32 a.m., ET, the instant
18   deposition ceased.)
19
20
21
22