

# Transcript of **Zachary Diggs**

Friday, September 10, 2021

*David Graham Goodman v. Kenneth W. Stolle, et al.*

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO (800.367.3376)
Scheduling@Trustpoint.One

Reference Number: 107454

1  to do at that point was up to him.  But he refused to
2  do anything and just laid on the ground.  He may have
3  said, I'm not going to go or I'm not going to get up.
4  I don't remember his specific statement.
5           So eventually we had to move him from this
6  hallway, he can't stay in the hallway until he's
7  ready to go home, and move him to his new location.
8  So that's why we had to physically move him to the
9  new housing.
10     Q.   Who gave him directions to stand up?
11     A.   I don't remember that, ma'am.
12     Q.   And was he told to stand up so he can
13  either get back in the wheelchair or walk?
14          MR. ROSEN:  Objection.  Asked and
15  answered.  You can answer.
16          THE WITNESS:  Yes, ma'am.
17  BY MS. ANDREWS:
18     Q.   You said eventually you have to move him.
19  So how did you move him?
20     A.   So I believe Repass was on one side, I was
21  on the other.  And then just kind of grabbed him by
22  his wrist, forearm, underneath his armpit, just

```
 1   physically started dragging him down the hallway.

 2        Q.   Did you lift him up from where he was on

 3   the ground?

 4        A.   Slightly, yes.  Yeah, I would have to.

 5        Q.   I may have misheard you.  Did you say

 6   slightly?

 7        A.   Yes, ma'am.  I would have to have

 8   physically picked him up off the ground, elevated

 9   part of his body off the ground to move him down the

10   hallway, yes.

11        Q.   So was Mr. Goodman upright when you and

12   Deputy Repass moved him down the hallway?

13        A.   Like upright as in standing straight up

14   and down, or just --

15        Q.   Yeah, was he --

16        A.   His body would have been -- he was laid on

17   his back on the ground, and he would have -- his

18   torso would have been lifted up, his legs would have

19   still been on the ground, and then we were physically

20   moving him down the hallway like that.

21        Q.   So he was on his back with his torso

22   lifted, and that's the position he was in when you
```

1  Q. So Mr. Diggs, at any point during this
2  encounter with Mr. Goodman, did you put your knee on
3  him?
4  A. Yes, ma'am.
5  Q. And when did that happen?
6  A. When we were removing the handcuffs in the
7  cell.
8  Q. And where did you put your knee?
9  A. In between his shoulder blades, the best
10 way to describe it.
11 Q. So not too far from his neck it sounds
12 like?
13       MR. ROSEN: Object to the form of the
14 question. Asked and answered. You can answer it
15 again.
16       THE WITNESS: Between the shoulder blades.
17 BY MS. ANDREWS:
18 Q. And why did you do that?
19 A. Just -- well, one is position when you
20 remove the handcuffs, to have a safe -- it's just
21 kind of an officer safety issue I think is the
22 easiest way to describe it. You're ensuring that the

1  A.  Yes, ma'am, I believe that's who wrote it.

2  Q.  How did you decide that she was going to
3  do the report and you were going to do a memo as
4  opposed to the other way around?

5  A.  You'd have to ask probably Moissett since
6  he was the supervisor.  He was most likely the one
7  that decided.  But I can't remember specifically why
8  that is.

9  Q.  Do you know if Corporal Moissett filled
10 out an incident report or wrote a memo?

11 A.  No, I do not know.  I don't specifically
12 remember him doing one.

13 Q.  Did you read Deputy Repass' report before
14 you wrote your memo?

15 A.  No, ma'am, I don't believe so.

16 Q.  Did you read her report before you
17 submitted your memo?

18 A.  Yes, ma'am.

19 Q.  And who did you submit that to?

20 A.  It probably went to whoever the sergeant
21 at intake was.  I don't remember.

22 Q.  And did the memo get submitted with the

1    A.    Again, the same thing.  At some point in
2 the past, but not anytime recently.
3    Q.    How about Deputy Hayes.  Have you spoken
4 with him about the lawsuit?
5    A.    Yes, ma'am.  The same thing.  When it
6 started, we spoke about it and then nothing recently.
7    Q.    Did you know Deputy Hayes before this
8 incident with Mr. Goodman?
9    A.    Did I know him like that he worked at the
10 sheriff's office or like in person?
11   Q.    Had you met him before?
12   A.    Well, we worked together.  I mean, we
13 worked with each other, yes, ma'am.
14   Q.    Do you know who Captain Linda Richie is?
15   A.    Yes, ma'am.
16   Q.    Who is she?
17   A.    She is the -- I don't know her exact
18 title, but she's part of the legal branch of the
19 sheriff's office.
20   Q.    And have you spoken with Captain Richie
21 about this lawsuit?
22   A.    Yes, ma'am.

1  Q.  When have you spoken with her?

2  A.  I would say over the last -- when the
3  lawsuit was restarted, we spoke just about the
4  paperwork that she had and the paperwork that she
5  needed from me.

6  Q.  Do you remember roughly when that was?

7  A.  No, ma'am, I couldn't tell you.  I'd have
8  to look at the dates.

9  Q.  Was it within the last year would you say?

10 A.  Yes, ma'am.  Yes.

11 Q.  And did you talk with her in that
12 conversation about anything other than the paperwork
13 that she had and the paperwork that she needed from
14 you?

15 A.  No, ma'am.

16 Q.  Have you had any other conversations with
17 her about the lawsuit?

18 A.  No, ma'am.

19 Q.  You still work for the Virginia Beach
20 Sheriff's Office, right?

21 A.  Yes, ma'am.

22 Q.  What's your job title today?