

# Transcript of **Crystal Repass**

Wednesday, September 8, 2021

***David Graham Goodman v. Kenneth W. Stolle, et al.***

www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO (800.367.3376)
Scheduling@Trustpoint.One

Reference Number: 107450

 1  almost to the floor in which he was going to be
 2  assigned.  I would say over halfway.
 3      Q.   So you said you used a pressure point
 4  behind his right ear; is that right?
 5      A.   Yes.
 6      Q.   Is that something that you are trained to
 7  do?
 8      A.   Yes.
 9      Q.   What situations are you trained to use
10  that in?
11      A.   Well, they're used as a defensive tactic
12  technique.  Instead of just strikes and kicks and
13  stuff, we're also taught pressure points to try to
14  apply a little bit of pain compliance, minimal force
15  to control an inmate.
16      Q.   And what were Diggs and Moissett doing
17  while you were applying the pressure point?
18      A.   We were trying to get -- they were trying
19  to get his hands behind his back so we could handcuff
20  him.
21      Q.   And why were you trying to handcuff him?
22      A.   Because now we're probably going to have

 1      A.    Yes.

 2      Q.    Do you know what DVR311 cameras 11 and 13
 3 are?

 4      A.    I don't want to speculate, but it would
 5 have been part of the incident.

 6      Q.    Did you review the footage from those
 7 cameras?

 8      A.    Yes.  According to this, yes.  I don't
 9 remember if I did or not, but according to my report,
10 I did.

11      Q.    So do you remember what the footage
12 showed?

13      A.    Well, the footage would have showed the
14 incident, but I don't remember reviewing it.  It was
15 so long ago.

16      Q.    So do you know what parts of the
17 correctional center the cameras captured?

18      A.    Most all of it's videoed.  So it would
19 have captured most of it.  But I don't know what
20 these DVR cameras are.

21      Q.    But so there would be cameras, say, in the
22 intake area, where you first encountered him, right?

1   A.   There are.
2   Q.   And are there cameras in the hallway that
3   you took Mr. Goodman down?
4   A.   Yes.
5   Q.   And are there cameras in the B building
6   first floor area, where you took him?
7   A.   Yes.
8   Q.   Are there cameras that would capture the
9   cell that you put him in?
10  A.   I don't know.  Sometimes there are,
11  sometimes they're not.  That specific cell, I don't
12  remember.
13  Q.   And do you know if anyone else reviewed
14  the video footage?
15  A.   It says all parties, so I would -- I would
16  assume they did.
17  Q.   But you don't remember?
18  A.   I did not see them.  I don't remember, no.
19  Q.   Did you write this part of the report,
20  where it says, "action taken," and then it describes
21  the cameras and other things?
22  A.   Yes.

1    A.   I mean, I spoke to her about everything.
2 I don't remember specifics.  Like I said, I've never
3 been sued before, so I mean, I talked to her about
4 it, yes.
5    Q.   If you look down at the next interrogatory
6 and response, your answer starts, "my only discussion
7 concerning the videotape of the incident was with
8 Linda Richie."  Do you remember having that
9 discussion with her?
10   A.   Yes.
11   Q.   When did that discussion happen?
12   A.   I just remember it happened.  I can't tell
13 you a date.
14   Q.   Do you remember if it was in the last
15 year, or was it longer ago than that?
16   A.   You know, it was probably within the last
17 year or so.
18   Q.   And what do you remember about that
19 conversation with Captain Richie?
20   A.   Well, because I saw in Goodman's lawsuit
21 that he wants the videotapes.  And obviously, you
22 know, I inquired about them, because that would be

```
 1   very helpful.  But they were not saved, because we
 2   were never -- I mean, it was investigated, and it was
 3   deemed unfounded.  So if it's unfounded, they don't
 4   save the documents -- the tapes.  That was my
 5   conversation with her.
 6        Q.   Do you know who makes that decision that
 7   it's unfounded?
 8             MR. ROSEN:  Objection, lack of foundation.
 9   You can answer.
10             THE WITNESS:  Our internal affairs.  I
11   don't know specifically who.
12   BY MS. ANDREWS:
13        Q.   So you approached Captain Richie about the
14   videotape; is that right?
15        A.   Yeah, I approached her about the entire
16   lawsuit.
17        Q.   But you asked her specifically about the
18   videotape in a conversation with her, right?
19             MR. ROSEN:  Object to the form of the
20   question, asked and answered.  Go ahead.  You can
21   answer again.
22             THE WITNESS:  Yes.
```