```
                IN THE UNITED STATES DISTRICT COURT

                FOR THE EASTERN DISTRICT OF VIRGINIA

                        (Alexandria Division)

   - - - - - - - - - - - - - - - X

   DAVID GRAHAM GOODMAN,          :

           Plaintiff,              :

   v.                              :  Case Action No.

   KENNETH W. STOLLE, et al.,     :  1:13-cv-540

           Defendants.             :

                                   X

                        Remote Deposition

                        Wednesday, September 8, 2021

           Deposition via Zoom of LINDA RICHIE, a
   witness herein, called for examination by counsel for
   Plaintiff in the above entitled matter, pursuant to
   notice, the witness being duly sworn by Desirae S.
   Jura, a Notary Public in and for the Commonwealth of
   Virginia, taken at 10:04 a.m., ET, and the
   proceedings being taken down by Desirae S. Jura, RPR,
   and transcribed under her direction.
```

1   what steps the people in the chain of command took to

2   review the footage or the incident report?

3              MR. ROSEN:  Object to the form of the

4   question.  You can answer, if you can.

5              THE WITNESS:  Other than the bottom where

6   it says, action taken, no further action requested,

7   and no investigation requested, then, no, I would not

8   have anything further than that.

9   BY MS. ANDREWS:

10      Q.   So once that investigative process, by

11  which I mean going up the chain of command until you

12  get to the point of this document that has the

13  lieutenant and the captain and Mark Shuster's

14  signatures, what happens to the video footage of the

15  incident at that point?

16             MR. ROSEN:  At the time of the incident

17  we're talking about, correct?

18             MS. ANDREWS:  Yes, in 2012.

19             THE WITNESS:  It stays on the DVR.  Any

20  footage that is recorded on the DVR stays on the DVR

21  until it overwrites itself.  We have -- and that is

22  based on the activity level of a specific camera, how

Trustpoint.One  Alderson
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1  long it stays on the DVR.  We have found that,

2  typically, it lasts for about 30 days if we don't

3  download from that DVR, and save it to an alternative

4  media system, such as a CD or a DVD.

5  BY MS. ANDREWS:

6      Q.   And under what circumstances would you

7  download video footage to an alternative media

8  system?

9           MR. ROSEN:  At the time of the incident?

10 BY MS. ANDREWS:

11     Q.   At the time of the incident.

12     A.   There would be several circumstances.  If

13 we had a complaint, if we anticipated possible

14 litigation, if there was a violation of policy or

15 procedures, if we received a subpoena or any type of

16 request for that video from an outside source, within

17 the timeframe that it was still available, we would

18 have downloaded it, and preserved it.

19     Q.   Okay.  So I want to take you to those in

20 turn.  So the first circumstance you said is when

21 there's a complaint.

22     A.   Correct.

1   actions?

2       A.   Absolutely.  He would have reviewed the

3   video and the report, to ensure that it was accurate,

4   based off of what was stated in the report.

5       Q.   So when this sentence goes on to say that

6   "the cameras were reviewed by all parties involved,

7   and are consistent with this report," who determined

8   that the cameras were consistent with this report?

9            MR. ROSEN:  Object to the form of the

10  question, lack of foundation.  You can answer that.

11           THE WITNESS:  I cannot answer for all the

12  other supervisors.  I can answer that at the time, in

13  internal affairs, it was our responsibility to review

14  the report and the cameras, and ensure that they were

15  accurate.  And there were, again, no violations,

16  training issues.

17  BY MS. ANDREWS:

18      Q.   Okay.  And do you know if the video

19  footage on these cameras was downloaded off of the

20  DVR and preserved?

21      A.   It was not.

22      Q.   It was automatically overwritten?

```
 1      A.   Yes.
 2      Q.   Do you know if Deputy Repass was informed
 3 about the fact that the video footage was
 4 overwritten?
 5      A.   No.  I don't know.
 6      Q.   You don't know or that she was not
 7 informed?
 8      A.   I don't know.
 9      Q.   I may be wrapping up.  Can we take another
10 five-minute break, just so I can make sure that there
11 isn't anything else that we need to cover?
12           THE WITNESS:  Sure.
13           MR. ROSEN:  Sure.  No problem.
14           (Recess.)
15 BY MS. ANDREWS:
16      Q.   So you said that internal affairs or
17 PSO -- are those terms interchangeable to you?
18      A.   Yes.
19      Q.   So you said that internal affairs would
20 have reviewed this incident with Deputy Repass and
21 Mr. Goodman, correct?
22      A.   Correct.
```

```
 1        Q.     Do you know what the outcome of that
 2   review was?
 3        A.     We did not open a formal investigation.
 4        Q.     Was there any other determination made,
 5   other than not opening a formal investigation?
 6        A.     No.  If there were any violations in
 7   policy or training, we would have opened a formal
 8   investigation.
 9        Q.     So did internal affairs determine that
10   there were no violations of policy or training?
11        A.     Correct.
12        Q.     And is that conclusion documented
13   anywhere?
14        A.     Other than our practice, no.
15        Q.     What do you mean by your practice?
16        A.     Other than that was our daily practice, to
17   review all incident reports and/or video recordings.
18        Q.     And how about for the incident with
19   Mr. Goodman and Deputy Hayes, internal affairs
20   reviewed that as well; is that right?
21        A.     Correct.
22        Q.     And did internal affairs determine that no
```

1  formal investigation needed to be opened?

2      A.   Correct.

3      Q.   Did internal affairs determine that there
4  were no violations of policy or training?

5      A.   Correct.

6      Q.   And would I be correct in assuming that
7  there's no documentation of that determination for
8  that specific incident with Deputy Hayes?

9      A.   Correct.

10     Q.   I have one more document that I would like
11 to send you, so I will email it to counsel now, and
12 drop it in the chat.  This will be Exhibit 6.

13              (Richie Exhibit No. 6 was identified
14               for the record.)

15          THE WITNESS:  I have it.

16 BY MS. ANDREWS:

17     Q.   Okay.  Have you seen this document before?

18     A.   Yes.

19     Q.   When did you see it?

20     A.   When I requested medical -- well, I would
21 have seen it at the time when the investigation --
22 hold on.  I would have seen it when we got

1    notification of the lawsuit, and I downloaded the

2    files to turn over to the attorney.

3         Q.    Okay.  And that would be when you got

4    notification that the lawsuit had been filed?

5         A.    Correct.

6         Q.    But you hadn't seen it before that?

7         A.    No, I would have had to request the

8    records from medical.

9         Q.    And you don't normally do that unless it's

10   a formal investigation; is that right?

11        A.    Correct.

12        Q.    Do you ever request the medical records

13   even if it's not a formal investigation, just as part

14   of the reviewing process?

15        A.    No.

16        Q.    You can take a look, and I know it's a

17   narrow column that's over on the right side of the

18   page.  But if you look in about the middle of that,

19   there is a sentence that starts, "inmate stated he

20   was upset."  Do you see that?

21        A.    Yes.

22        Q.    Can you read that sentence for me?

1   A.   "Inmate stated he was upset and expressed
2   his interest in viewing the videos for a lawsuit
3   against those involved in this incident."
4   Q.   Was the internal affairs office made aware
5   of this request that the inmate made?
6   A.   Not to my knowledge.
7   Q.   And I think you said before that medical
8   staff are required to notify someone if an inmate
9   makes a complaint?
10  A.   Correct.
11  Q.   So would this -- do you know who Nurse
12  Courtney Hoyles is?
13  A.   I don't know her myself, off the top of my
14  head.  I may recognize her if I saw her face again.
15  Q.   So do you know if she notified anyone in
16  the sheriff's office about this complaint that
17  Mr. Goodman made?
18       MR. ROSEN:  Object to the form of the
19  question, asked and answered.  Go ahead and answer it
20  again.
21       THE WITNESS:  No, I don't know.
22       MS. ANDREWS:  I don't think I have

Trustpoint.One | Alderson
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)

1  anything further.

2  MR. ROSEN: I just have two brief

3  questions.

4  EXAMINATION BY COUNSEL FOR DEFENDANTS

5  BY MR. ROSEN:

6  Q. Counsel asked you when you would preserve

7  DVR videos, and I wanted to ask if you would also

8  preserve them if you received a request from the

9  attorney to preserve any such videos?

10  A. Yes, I would treat that as a possible

11  litigation hold, and I would preserve those.

12  Q. Okay. And also, you were asked about the

13  records destruction policy of the sheriff's

14  department. At the time of this incident, were you

15  ever made aware that the Library of Congress --

16  sorry, the Virginia Library policy regarding the

17  destruction of records ever applied to DVR records

18  that automatically just overwrote data?

19  A. No.

20  MR. ROSEN: That's the only questions I

21  have.

22  FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF

Trustpoint.One | Alderson.
www.trustpoint.one
www.aldersonreporting.com
800.FOR.DEPO
(800.367.3376)