# Report of Dora B. Schriro, EdD, JD

## October 8, 2021

## Plaintiff's Expert

## *Goodman v. Stolle et al.*, Case No. 1:13-cv-540 (E.D. Va.)

**Witness Qualifications**

I am a career public servant who has served as an executive-level administrator and policy maker, and homeland security advisor. I have led three state and two city criminal justice agencies and a federal office in the U.S. Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE).

I was Commissioner of two city jail systems, the St. Louis City Division of Corrections from 2001 to 2003, and the New York City (NYC) Department of Correction from 2009 to 2014. Previously, I served as Warden of a city jail in St. Louis City, Missouri, from 1989 to 1993, and Assistant Commissioner for Program Services in the NYC Department of Correction from 1985 to 1989.

Additionally, I was Director of two state correctional systems, the Missouri Department of Corrections from 1993 to 2001, and the Arizona Department of Corrections from 2003 to 2009. During my tenure as Director of the Missouri Department of Corrections, I received the Association of Correctional Administrators' Award for Outstanding Leadership. During my tenure in Arizona, our department was the first correctional system in the country to receive the Innovations in American Government award for a prison-based reform, Getting Ready, a systemwide pre-release preparation initiative imbued with the norms and values mirroring those of the community in which all inmates participated throughout their incarceration.

I was also Commissioner of the Connecticut Department of Emergency Services and Public Protection consisting of six state agencies including the Connecticut State Police and Police Officer Standards and Training (POST), the state's local police departments credentialing authority, from 2014 through 2018. I served concurrently as Connecticut's Homeland Security Advisor from 2016 through 2018. My DHS security clearance was Top Secret. In both Arizona and Connecticut, I also served as an ex officio member of the state's POST Council.

In addition, I was Senior Advisor to DHS Secretary Janet Napolitano on ICE Detention and Removal and founding Director of the ICE Office of Detention Policy and Planning in 2009. During my tenure, I authored "ICE Detention Policies and Practices: A Recommended Course of Action for Systems Reform," a report that DHS adopted as its template for immigration detention reform.

I was a member of the adjunct faculties of University of Missouri-St. Louis Department of Criminology from 1990 to 1998, St. Louis University School of Law from 2000 to 2002, and Arizona State University Sandra Day O'Connor School of Law from 2005 to 2008.

I am knowledgeable about the case law impacting pre-trial and sentenced populations and civil detainees as well as the American Correction Association Adult Local Detention Facility

1

Standards and the ICE Performance-Based and National Detention Standards. I participated in the development of both the American Bar Association (ABA) Treatment of Prisoners, its professional standards for state and local correctional systems, and its Civil Immigration Detention Standards for facilities used by ICE. Additionally, I am knowledgeable about the administration and operation of correctional facilities and immigration detention centers, each system's workforce, and the people in their custody.

I have served as a Corrections Detention expert since 2013. My clients have included the California Department of Justice, Hampton County, Massachusetts Sheriff's Department, Disability Rights California, a quasi-governmental agency, St. Louis University School of Law Clinic, the American Civil Liberties Union, Southern Poverty Law Center, and Human Rights First.

## Professional Vita

A complete and correct Résumé including a list of my publications from the last ten years, and related professional affiliations and recognition, is attached as Appendix A.

## Other Cases

In the last four years, I have testified by deposition as a Corrections expert in the matters of *Endicott v. Hurley et al.*, No. 2:14-CV-107 DDN (E.D. Mo.) in 2020, and *Doe v. Senger et al.*, No. 20-cv-3217-DPR (W.D. Mo.) in 2021.

## Materials Considered

The materials I considered in forming my opinions are cited throughout this report and listed in the attached Appendix B. I reserve the right to supplement or amend my report if new materials become available (including the affidavits and depositions of Mr. Goodman and other witnesses and/or additional materials subpoenaed by the Defendants).

## Compensation

I am being compensated for my work on this matter at a rate of $225/hour.

2

## I. A Brief Summary of the Facts

### Introduction

1. David Graham Goodman is a mobility-impaired inmate previously incarcerated at the Chesapeake Correctional Center (CCC) and currently incarcerated at the River North Correctional Center. In 2012, Mr. Goodman already suffered from significant back, neck, and shoulder issues and service-related Post-Traumatic Stress Disorder (PTSD).[1] On November 7, 2012, Mr. Goodman, age 57 years at the time, was transported from the CCC to the Virginia Beach Correctional Center (VBCC) in advance of a probation violation hearing to be held later that morning at a nearby courthouse.[2] He had been held earlier that year at VBCC for another court appearance.[3] At Intake, VBCC updated Mr. Goodman's medical and criminal histories. His VBCC facility file noted he was not an escape risk and had neither gang affiliations[4] nor a history of assaults or frequent fights.[5] Mr. Goodman's VBCC custody classification score was 15,[6] minimum security.[7] His medical history noted spinal cord injuries, and cervical fusion of the neck and back.[8] Mr. Goodman sometimes used a wheelchair and otherwise used a cane. He had intermittent access to a wheelchair at VBCC and deputies did not always allow him to use his wheelchair or a cane.[9]

### Incident 1, Deputy Hayes

2. Defendant Deputy Curtis Hayes recalled seeing Mr. Goodman using an assistive device when he first arrived at VBCC on the morning of November 7, 2012. He was uncertain whether it was a walker or a cane.[10]

3. After his court hearing, Mr. Goodman was returned to VBCC. According to Mr. Goodman, he was placed on a bench in a holding area, to await transport back the CCC. About an hour later, Mr. Goodman was informed that he would not return to his facility until the following morning.[11]

4. Sometime thereafter, Dep. Hayes arrived in the intake area and told Mr. Goodman he had come to take him to the cell where he would spend the night. Mr. Goodman told Dep. Hayes that he

---

[1] Plaintiff's Responses to Defendants' First Set of Interrogatories, No. 1:13-cv-540 ("Plaintiff's Interrogatory Responses"), Interrogatory 9.

[2] Custodial Transportation Order, Stolle 005.

[3] VBCC Open Problems, Apr. 2, 2012, Stolle 019.

[4] Face Sheet Notes, Stolle 003; VBCC Classification Questions, Stolle 010-011.

[5] VBCC C-800A Mental Health Screen, Stolle 030.

[6] VBCC Classification Questions, Stolle 010-011; Diggs Deposition at 99.

[7] Diggs Deposition at 96, 99.

[8] VBCC Open Problems, Apr. 2, 2012, Stolle 019.

[9] Plaintiff's Interrogatory Responses, Interrogatory 9.

[10] Hayes Deposition at 7.

[11] Plaintiff's Interrogatory Responses, Interrogatory 9.

could not walk there without a cane, and asked whether he would be placed on a lower bunk because of his spinal cord issues. Dep. Hayes told Mr. Goodman that he would be on the floor.[12]

5.  Mr. Goodman tried to explain to Dep. Hayes that he needed to be in a cell with a bed because of the injuries to his back, neck and shoulder, but Dep. Hayes refused to listen. According to Mr. Goodman, Dep. Hayes reacted angrily and grabbed him by the neck of his jumpsuit. Mr. Goodman went limp and fell to the floor but at no time did he physically resist Dep. Hayes or fight back. Dep. Hayes dragged Mr. Goodman across a hallway then threw him onto the floor of another cell. Unable to get up without assistance, Mr. Goodman remained on the floor for some time. Mr. Blythe, an inmate in the area, witnessed this use of force.[13]

6.  Dep. Hayes testified during his deposition that when he arrived to take Mr. Goodman to his housing assignment, he instructed Mr. Goodman to get in his wheelchair and Mr. Goodman complied. In response to Mr. Goodman's statement that he did not want to be assigned to a cell where he would sleep on the floor, Dep. Hayes told him that he would be on the floor. According to Dep. Hayes, Mr. Goodman then got out of his wheelchair and returned to the bench. Dep. Hayes testified that he then "grabbed his upper arm and his elbow and stood him up," and Mr. Goodman dropped his weight to the floor.[14]

7.  During his deposition, Dep. Hayes confirmed that he did pull Mr. Goodman across the floor to a holding cell, inserting his hands under Mr. Goodman's armpits and pulling him on his back.[15] Dep. Hayes characterized this use of force as a "safety pull"[16] although neither he nor Mr. Goodman was in any danger and no one else was reported to be in the area. He also testified that Mr. Goodman did not physically resist him, try to attack him, or try to get away from him; Mr. Goodman merely dropped his weight and refused to comply with Dep. Hayes's directions.[17]

8.  Dep. Hayes testified that Mr. Goodman said he would "kick my [Dep. Hayes's] fucking ass."[18] He also acknowledged Mr. Goodman was upset because he was to remain at VBCC that night. Dep. Hayes also testified that he did not recall Mr. Goodman making any other threats.[19]

9.  When asked during his deposition how he dealt with inmates who cursed a lot; Dep. Hayes responded, "on a case-by-case basis."[20] He testified that deputies had received Critical Intervention Training (CIT) "to understand why an inmate is upset and then take the proper

---

[12] *Id.*

[13] *Id.*

[14] Hayes Deposition at 29-31, 33-34.

[15] *Id.* at 39

[16] *Id.* at 58.

[17] *Id.* at 32-34.

[18] *Id.* at 26.

[19] *Id.* at 23, 61.

[20] *Id.* at 23-24.

4

steps to ensure our safety and theirs."[21] Mr. Goodman repeatedly told Dep. Hayes why he could not stay overnight in a cell that had no bed, and why he could not walk without the aid of a cane or a wheelchair. Dep. Hayes never acknowledged his concerns or contacted a superior officer. Instead, he dragged him across a hallway, and threw him onto the floor of a cell then left him there without an assistive device so that he could get back up on his own.[22]

10. Dep. Hayes noted in his incident report that Mr. Goodman was seen by Nurse S. Smith, and that he had notified Sergeant Parris.[23] There is no entry in Mr. Goodman's medical file by a Nurse Smith or any other medical staff following this use of force. The Virginia Beach Sheriff's Office (VBSO) did not open a formal investigation into the incident.[24]

11. Dep. Hayes also stated in his incident report that DVR 313, cameras 12, 13, and 14 captured footage of the incident and it had been reviewed.[25] Dep. Hayes testified during his deposition that he accessed the video on a computer in the facility and reviewed it before submitting his report that day. He stated it captured everything "from start to finish," and was consistent with his account of the incident.[26]  However, Dep. Hayes also testified during his deposition that there was no camera in the holding cell where he threw Mr. Goodman onto the floor.[27] The footage was not preserved,[28] so I have not been able to review it.

12. There is no indication that Dep. Hayes submitted any paperwork to initiate disciplinary proceedings for any actions by Mr. Goodman that Dep. Hayes stated were the bases to utilize force.

13. It is my opinion: Dep. Hayes immediately lost patience with Mr. Goodman who he knew to have physical limitations and was clearly in a distressed state, needlessly escalating their exchange, and repeatedly employing unnecessary and inappropriate force.

### Incident 2, Corporal Moissett and Deputies Diggs and Repass

14. According to Mr. Goodman, Defendants Corporal Todd Moissett, Deputy Zachary Diggs, and Deputy Crystal Repass arrived sometime later to take Mr. Goodman from the cell where he was left by Dep. Hayes to his housing assignment.[29]

---

[21] *Id.* at 25.

[22] Plaintiff's Interrogatory Responses, Interrogatory 9.

[23] Hayes Incident Report, Stolle 070.

[24] Richie Deposition at 32.

[25] Hayes Incident Report, Stolle 070.

[26] Hayes Deposition at 66-67.

[27] *Id.* at 68-69.

[28] Affidavit of Capt. Linda Richie, Doc. No. 74 (Jul. 14, 2015).

[29] Plaintiff's Interrogatory Responses, Interrogatory 9.

15. Mr. Goodman stated Sergeant Roland directed them to bring him a wheelchair, and that he helped him get in. Mr. Goodman was not certain whether Cpl. Moissett or Dep. Diggs then began pushing his wheelchair down a hallway.[30]

16. Dep. Repass reported that upon her arrival, she instructed Mr. Goodman to stand up and come with her; when he told Dep. Repass that he needed a wheelchair, she asked Cpl. Moissett to get it.[31] When Cpl. Moissett returned with the wheelchair, the three officers placed Mr. Goodman in the wheelchair, and Cpl. Moissett began pushing his wheelchair down the hallway to the B wing.[32]

17. Shortly after they started down the hallway, Mr. Goodman was somehow dislodged from his wheelchair.[33] Mr. Goodman insists it was not intentional on his part, and he believes he may have lost consciousness, possibly because he had not eaten or received his medication, or that the wheelchair may gotten stuck.[34] According to Mr. Goodman, Cpl. Moissett and Dep. Diggs grabbed him and then slammed him back down to the ground again before yanking his arms over his head, at which point Cpl. Moissett cuffed his hands behind his back. Once secured, Cpl. Moissett and Dep. Diggs dragged Mr. Goodman the rest of the way to his assigned cell; Dep. Repass walked alongside. Mr. Goodman told all of them that he had back and spinal cord damage, he could not walk any distance, and was in pain. They were not dissuaded.[35]

18. Upon reaching his cell, Cpl. Moissett and Dep. Diggs dragged in Mr. Goodman, then slammed him onto the floor again. Dep. Diggs stood on Mr. Goodman's back and Dep. Repass held his neck down while the handcuffs were removed. Once Mr. Goodman's left arm was released, Dep. Repass knelt on his left hand and at another time on his neck. She pushed his face into the floor. Again, Mr. Goodman told the officers about his disabilities. At some point during this encounter, Dep. Repass also pushed her thumb into a pressure point behind Mr. Goodman's right ear, and Mr. Goodman reported going in and out of consciousness. He was unconscious when they exited his cell, leaving him alone without having received any medical attention.[36]

19. Mr. Goodman believes he lay on the cell floor for approximately thirty minutes until Mr. Brandon Coburn, an inmate in an adjoining cell who had been attempting to rouse Mr. Goodman, was able to alert another deputy who notified Medical.[37] Nurse C. Hoyles responded.[38] She noted in his chart that she found Mr. Goodman laying on his left side leaning against the wall and holding his right arm at a 90-degree angle, with blood pooled on the floor

---

[30] *Id.*

[31] Repass Deposition at 13.

[32] *Id.* at 16.

[33] Inmate Statement, DGG00000002-3; Plaintiff's Interrogatory Responses, Interrogatory 9.

[34] Inmate Statement, DGG00000002-3; Plaintiff's Interrogatory Responses, Interrogatory 9.

[35] Plaintiff's Interrogatory Responses, Interrogatory 9.

[36] *Id.*

[37] *Id.*

[38] Nurse Hoyles Note, Stolle 020-021.

around his face. She also noted that Mr. Goodman stated he was "thrown on the ground," "his head was busted open" and he was "dizzy and in pain."[39] According to Mr. Goodman, the nurse said that he should be taken to the hospital, but that request was denied by a sergeant.[40]

20. Nurse Hoyles also recorded in Mr. Goodman's chart that "he was upset" and "expressed his interest in viewing the videos for a lawsuit against those involved in the incident."[41] Medical staff are required to report such requests to a supervisor or to the Office of Professional Standards and Accountability (PSO).[42] Pursuant to VBSO policy, immediately upon receipt of a complaint including those made by an inmate, the PSO is supposed to investigate, record and track that complaint.[43]

21. Upon his return to CCC early on the morning of November 8, 2012, Mr. Goodman also submitted an Inmate Statement that included being denied access to a wheelchair, Defendants' uses of force, assignment to a cell without a bed, the injuries he sustained, and the pain he still was experiencing.[44] The Chesapeake Sheriff's Office (CSO) submitted an incident report that included Mr. Goodman's statement.[45]

22. The CCC's incident report included a medical evaluation and photographs taken of his injuries within hours of his return.[46] CCC's Charge Nurse, D. Jacobs, examined Mr. Goodman and reported, "Both lower legs noted to be red and swollen upon assessment, multiple bruises noted to back of both arms. Left hand red and swollen, tender to touch (limited range of motion). Both knees red and swollen, also tender to touch. Left eye noted to be blue upon assessment. Band-aid placed over eye."[47]

23. Dep. Repass filed an incident report with the VBSO on the day of the incident.[48] Dep. Diggs prepared a memorandum to accompany Dep. Repass' report, which he read before submitting his memo.[49] Cpl. Moissett did not file any paperwork.[50] When asked during his deposition why

---

[39] *Id.*

[40] Plaintiff's Interrogatory Responses, Interrogatory 9.

[41] Nurse Hoyles Note, Stolle 020.

[42] Richie Deposition at 20.

[43] Professional Standards and Accountability, #02-10-00, rev. Feb. 29, 2012, Stolle 077.

[44] Inmate Statement, DGG00000002-3.

[45] Chesapeake Sheriff's Office Incident Report, CHSSF00000207.

[46] *Id.*

[47] *Id.*

[48] Repass Incident Report, Stolle 071.

[49] Diggs Memorandum, Stolle 072; Diggs Deposition at 52-53.

[50] Moissett Deposition at 56.

he had not submitted anything in writing, Cpl. Moissett stated it was because he had not used any force.[51] The VBSO did not open a formal investigation into the incident.[52]

24. Defendants assert Mr. Goodman threw himself out of his wheelchair intentionally.[53] But they did not return him to the wheelchair or call for back-up. Instead, Dep. Repass and Dep. Diggs lifted him to his feet, each one inserted a hand under his arm just below his shoulders, and they began dragging him down the hallway.[54] They stated Mr. Goodman tried to pull his arm away from Dep. Diggs, so the deputies rolled Mr. Goodman onto his stomach, and Dep. Repass used a pressure point behind his right ear to achieve compliance.[55] Cpl. Moissett handcuffed Mr. Goodman.[56] Then Deps. Diggs and Repass "walked" Mr. Goodman the rest of the way to his cell.[57] All three reported Mr. Goodman tried to bang his head against the wall and doorframes along the way.[58]

25. Defendants also attested, upon approaching his cell, Deps. Diggs and Repass put Mr. Goodman up against the wall while Dep. Duncan, the floor deputy who was assigned to that area, unlocked a door.[59] This is when Cpl. Moissett stated Mr. Goodman succeeded in hitting his head hard on the wall, injuring his forehead.[60]

26. Dep. Diggs testified that he, Dep. Repass, and Cpl. Moissett brought Mr. Goodman to his cell, and that once in the cell, Dep. Diggs put his knee on the T-3 area of Mr. Goodman's back (between the shoulder blades) while Dep. Repass removed Mr. Goodman's handcuffs. He said that he placed his knee on Mr. Goodman's back partly as a method of control and partly because there was not enough room in the cell to put his knee elsewhere. He also testified that Mr. Goodman was offered medical attention but refused.[61]

27. Dep. Repass testified that Dep. Duncan opened the door to Mr. Goodman's cell. She also confirmed she was the one who removed Mr. Goodman's handcuffs once in the cell. She said that she assumed he was offered medical attention and that he had consented because that is what is required when force is used, and she had heard later that he had been seen in his cell by a nurse.[62]

---

[51] *Id.*

[52] Richie Deposition at 50-51.

[53] Repass Incident Report, Stolle 071; Diggs Memorandum, Stolle 072; Moissett Deposition at 28.

[54] Diggs Deposition at 29-32.

[55] *Id.* at 32; Repass Deposition at 20-22.

[56] Diggs Deposition at 33; Moissett Deposition at 33.

[57] Repass Deposition at 26.

[58] *Id.* at 26; Diggs Deposition at 42; Moissett Deposition at 39.

[59] Repass Deposition at 26-28; Moissett Deposition at 39-42.

[60] Moissett Deposition at 41-42.

[61] Diggs Deposition at 47, 49-51; Diggs Memorandum, Stolle 072.

[62] Repass Deposition at 27, 30-31.

28. Cpl. Moissett testified during his deposition that he has no recollection of escorting Mr. Goodman once they got to the B wing, or of entering Mr. Goodman's cell.[63] He also stated that he did not know whether Mr. Goodman committed any disciplinary violations during their encounter.[64]

29. Once in the cell, according to the Affidavits of Cpl. Moissett[65] and Dep. Repass,[66] "Plaintiff complied with all verbal commands. All Deputies exited the cell without further incident." Dep. Repass reiterated during her deposition that Mr. Goodman was "compliant once [they] entered the cell."[67] Likewise, Dep. Diggs testified during his deposition that after Mr. Goodman tried to hit his head, Mr. Goodman had "calmed down and relaxed" and "continue[d] without any more issues … to the housing location," and that Mr. Goodman complied with the direction he received to kneel upon entering the cell.[68]

30. Dep. Repass and Cpl. Moissett both stated that Mr. Goodman did not try to attack them.[69] Dep. Diggs described Mr. Goodman as "passively non-compliant."[70] He also stated as he and Dep. Repass were escorting Mr. Goodman down the hallway to his cell, Mr. Goodman did not do "anything that was unreasonable."[71] Dep. Repass also testified Mr. Goodman never took a swing at or tried to punch her or harm any of the other officers at any time.[72]

31. Dep. Repass submitted an Incident Report. In it, she stated, "DVR 311 cameras 11 and 13 were reviewed by all parties involved" and concluded the cameras were "consistent with this report."[73] When deposed however, she could no longer recall who were "all parties involved."[74] Dep. Diggs said he did not watch the video,[75] and Cpl. Moissett could not remember whether or not he had.[76] The video footage of this incident was not preserved,[77] so I have not been able to review it.

---

[63] Moissett Deposition at 45-48.

[64] *Id.* at 66.

[65] Affidavit of Sergeant T.C. Moissett, Doc. No. 96-6 (Aug. 26, 2018).

[66] Affidavit of Deputy C. Repass, Doc. No. 96-4 (Aug. 26, 2018).

[67] Repass Deposition at 29.

[68] Diggs Deposition at 41, 45.

[69] Moissett Deposition at 43-44; Repass Deposition at 67.

[70] Diggs Deposition at 37.

[71] *Id.* at 41.

[72] Repass Deposition at 67.

[73] Repass Incident Report, Stolle 071; Repass Deposition at 42.

[74] Repass Deposition at 41.

[75] Diggs Deposition at 61-62.

[76] Moissett Deposition at 65-66.

[77] Affidavit of Capt. Linda Richie, Doc. No. 74 (Jul. 14, 2015).

32. None of the three officers submitted paperwork to initiate disciplinary actions for Mr. Goodman.[78] When asked why, Dep. Repass said during her deposition that VBCC policy did not require deputies to write up inmates; issuing a disciplinary ticket was at deputies' discretion.[79] Dep. Diggs stated, "I didn't think I ever decided one way or the other."[80]

33. It is my opinion: Cpl. Moissett, Dep. Diggs, and Dep. Repass immediately lost patience with Mr. Goodman who they knew to have physical limitations and was clearly in a distressed state, needlessly escalating their exchange, and repeatedly employing unnecessary and inappropriate force.

## II. Use of Force

34. In my experience, correctional practice is premised primarily upon case law, establishing minimum standards with which correctional staff must comply. These standards are the bases for correctional policies and procedures.

35. The authority to use force is reserved for only a few disciplines of which corrections is one. The use of force comes with the requirement that custody staff's application of force is no more or longer than needed to regain or maintain control. Generally, the expectation is that within the correctional facility, verbal instruction is sufficient. Physical contact, if necessary, should begin with non-confrontational contact such as a touch to the shoulder or placement of the officer's hand under the inmate's elbow.

36. In my experience, there is no policy more critical to an inmate's conditions of confinement than Use of Force. Without crystal clear written instruction, ample training, and continual supervision, the possibility of unnecessary and excessive force is ever-present.

37. The VBSO has a Use of Force policy and provides Use of Force training for its deputies including those who are assigned to the VBCC. It conveys a similar sentiment: "The propriety and extent of [the] use [of force] directly reflects on the standing of the agency within its own community."[81]

38. The VBSO issued its Use of Force Policy in 1990. I have reviewed a copy of three revisions to the policy since 1990 – in 2009, 2013, and 2020. The 2009 Use of Force policy (rev. Mar. 23, 2009)[82] was in effect in November 2012 when Mr. Goodman was detained overnight at VBCC.

---

[78] Moissett Deposition at 66; Repass Deposition at 35-36; Diggs Deposition at 112.

[79] Repass Deposition at 35-36.

[80] Diggs Deposition at 112.

[81] VBSO Use of Force Policy, #11-01-00, Rev. Mar. 23, 2009 ("2009 Use of Force Policy"), Stolle 1344.

[82] 2009 Use of Force Policy, Stolle 1343-48.

39. It was the policy of the VBSO in 2012, as it is today, that force may be used when necessary but only to the extent reasonable and consistent with department policy.[83] VBSO's Use of Force policy applies to deputies assigned to the field and to the VBCC, its correctional center.[84]

40. According to VBSO policy, and consistent with my understanding and experience, there are two types of force, deadly force and non-deadly force. Deadly force is expressly prohibited in a correctional setting even to prevent the escape of an unarmed inmate unless the deputy has a reasonable belief that the escape poses a significant threat of death or serious injury to others.[85] Non-deadly force may be utilized when it is the only means to control an inmate in a correctional facility.[86]

41. According to VBSO policy, and consistent with my understanding and experience, force is excessive when its application is inappropriate to the circumstances.[87] Inappropriate force is more force than reasonably necessary to control a given situation.[88] In evaluating the application of force, the deputy should consider (a) the need for force to elicit compliance, (b) the relationship of the amount used to the need, and (c) the nature and extent of injury, if any, as well as (d) the size, stature and overall condition of the inmate, (e) the number of deputies opposing the number of aggressively resisting inmates, if any, and (f) the nature of the "emergency of the moment" if there is one. The object of the level of force selected is to gain control while minimizing the risk of injury to deputies and inmates.[89]

42. To determine whether and what level of non-deadly force is necessary, the deputy must differentiate between (a) passive non-compliance and (b) aggressive non-compliance.[90] Passive non-compliance is an inmate who refuses to comply with a lawful order but is not physically resisting or attacking the deputy, whereas aggressive non-compliance is when an inmate resists the deputy's control, or attacks or shows intent to attack. Even in instances when the inmate is aggressively non-compliant, the deputy must not apply anything more than the minimum force reasonably necessary to prevent harm to him or herself or others.[91] The VBSO's distinction between passive non-compliance and aggressive non-compliance is consistent with my own understanding and experience.

---

[83] *Id.*, Stolle 1344; VBSO Use of Force Policy, #11-01-00, Rev. Jul. 9, 2020 ("2020 Use of Force Policy"), Stolle 084.

[84] Asuncion Deposition at 13.

[85] VBSO Use of Force training, Stolle 109-110. *See also* 2020 Use of Force Policy, Stolle 086.

[86] 2009 Use of Force Policy, Stolle 1346.

[87] *Id.*, Stolle 1344.

[88] VBSO Use of Force training, Stolle 229.

[89] 2009 Use of Force Policy, Stolle 1346-47.

[90] VBSO Use of Force training, Stolle 110.

[91] *Id.*

11

43. VBSO policy permits several forms of non-deadly force: (a) officer presence, (b) verbal commands, (c) "Hands-on,"[92] otherwise known as Defensive Tactics and Compliance Techniques, that is, pain compliance and targeted pressure techniques, and (d) Intermediate Weapons, specifically chemical agents.[93] The industry standard is that certain "hands-on" techniques such as activating pressure points may be appropriate when someone is actively resisting or assaulting a deputy, but should not be used on resisters who remain docile as they are merely failing to do what is asked of them.[94] Mr. Goodman was a docile resister throughout his encounters with the defendants.

44. The VBSO's Use of Force training materials also introduce the VBSO's use of force philosophy. Its training materials also provide instruction about its application specifically for deputies assigned to the VBCC.[95]

45. VBSO's use of force philosophy reiterates force is only used as a last resort[96] and when it is used, it must be the least force possible along the VBSO's continuum of control.[97] To comply with this, every deputy must be able to recognize and respond appropriately to (a) increasing levels of threat versus (b) decreasing levels of threat.[98]

46. The correctional facility by its nature already affords assigned deputies a greater degree of control over individuals than they have on the street. VBSO's philosophy about use of force emphasizes the importance of the deputy's interpersonal skills when dealing with an inmate in a correctional facility:[99]

    "(1) Ask them to comply in a professional manner (verbal commands need to be emphasized).

    (2) Tell them (talking our way out of a situation is better than physical tactics).

    (3) Ensure compliance (use physical tactics as a last resort)."

47. Another version of VBSO's training on defensive tactics directs deputies working in a correctional facility, "This does not mean you have to go hands on yourself. Call for assistance and contact your supervisor."[100]

---

[92] *Id.*

[93] 2009 Use of Force Policy, Stolle 1346-47.

[94] Michael Schlosser and Dallas Schlosser, "Gaining Compliance with Targeted Pressure," Police Magazine (Apr. 7, 2016), https://www.policemag.com/342012/gaining-compliance-with-targeted-pressure.

[95] *See, e.g.*, VBSO Use of Force training, Stolle 136-37

[96] *Id.*, Stolle 136.

[97] *Id.*, Stolle 136-37.

[98] *Id.*

[99] *Id.*

[100] *Id.*, Stolle 268.

48. Additional information also important to a viable Use of Force policy is found in several other VBSO policies referenced above: Security Equipment Recordings[101] and Records Destruction.[102] In my experience, practices such as the use of video cameras and retention protocols help to ensure that the authority to use force is exercised as intended – that reports and recordings are preserved to hold offending officers and inmates accountable as well as to continually assess the efficacy of the agency's training program and supervisors' oversight of the workforce. Timely and accurate Use of Force reporting is another critical component.[103] Per VBSO policy, whenever a deputy takes an action that results, or is alleged to have resulted, in the injury of another person, and/or applies force, the deputy is required to submit a written report,[104] which Cpl. Moissett failed to do. Also of consequence is Professional Standards and Accountability (PSO) directing the investigation of all complaints, including those of inmates, about VBSO personnel, policies or procedures, another protection Mr. Goodman was not afforded.[105]

49. In my experience, custody staff are key to the escalation or de-escalation of an interaction with a non-compliant inmate. They determine and direct how a resolution is reached and what that resolution will be. Their success is contingent upon the extent to which, if at all, they are mindful of the inmate's body language, overall demeanor, the verbal exchange, and non-verbal signals, and whether or not they can effectively utilize the continuum of control.

50. It is my opinion: Had Defendants listened to Mr. Goodman more, expressed interest in his plight and conveyed a bit of empathy, the outcome could have been appreciably different, and better for everyone. As the VBSO's Use of Force training emphasizes, it is important that the deputies consider the numbers of officers and inmates involved – Mr. Goodman was outnumbered three to one in the second incident, and with regard to both encounters he was appreciably older, weaker, and in poor health. Other areas where I found all four officers to be particularly deficient were both (a) their propensity to escalate each encounter despite the fact that there was no urgency in either instance (VBCC's "emergency of the moment")[106] – the hallways were not crowded, shift change had concluded, and Mr. Goodman had not taken any untoward act to harm any of the officers; and (b) their unwillingness or inability to recognize that Mr. Goodman was passively resistant. Defendants were the ones who escalated both encounters. Had Defendants complied with the appropriate use of force standards outlined above, their encounters with Mr. Goodman would likely have been uneventful.

### III. Findings

51. It is my opinion: The force employed by Defendants Hayes, Moissett, Diggs, and Repass was unnecessary and inappropriate in the circumstances and resulted in very serious injuries to Mr.

---

[101] Security Equipment Recordings, #PS 01-00-02, Aug. 29, 2008, Stolle 075-076.

[102] Records Destruction, #05-09-00, Rev. Sep. 22, 2020, Stolle 083.

[103] 2009 Use of Force Policy, Stolle 1347.

[104] *Id.*

[105] Professional Standards and Accountability, #02-10-00, Rev. Feb. 29, 2012, Stolle 077.

[106] VBSO's Use of Force training, Stolle 102.

Goodman. His mobility is further impaired, he continues to continue experience severe pain in his neck, shoulders, and back, and his left hand required surgery affording only limited improvement.[107]

### Unnecessary and Inappropriate Force, Incident 1, Deputy Hayes

52. Dep. Hayes was aware Mr. Goodman used an assistive device to ambulate. Dep. Hayes recalls seeing him in the Intake area upon his arrival, walking with the aid of a cane or a walker.[108]

53. Mr. Goodman tried to explain to Dep. Hayes that he was physically incapable of sleeping on the floor, and he listed the physical conditions that prevented him from doing so.[109]

54. Dep. Hayes became angry and grabbed Mr. Goodman by the neck of his jumpsuit. Mr. Goodman went limp and fell to the floor. He did not physically resist or fight back.[110]

55. Dep. Hayes dragged Mr. Goodman across a hallway, then threw him onto the floor of a holding cell and left him there. Again, Mr. Goodman did not physically resist or fight back. In fact, he was unable to get up without assistance and remained on the floor of the cell for some time.[111]

56. Dep. Hayes admits that Mr. Goodman did not physically resist him, try to attack him, or try to get away from him. According to Dep. Hayes, Mr. Goodman complied with Dep. Hayes's direction to get into the wheelchair to be taken to the Medical Unit where he believed he would spend the night. It was only when Mr. Goodman inquired further of Dep. Hayes whether he was assigned to a bed or to the floor, and he learned that he would be sleeping on the floor, that Mr. Goodman got out of the wheelchair and sat back down on the bench.[112]

57. There is no indication that Dep. Hayes ever contacted Classification, Medical, or a superior officer about Mr. Goodman's housing assignment or handicapping conditions.[113]

58. Dep. Hayes did not recall ever calling for back-up.[114]

59. Dep. Hayes testified Mr. Goodman told him that he would "kick his […] ass."[115] Were this the case, as Dep. Hayes testified, this was a verbal threat that Mr. Goodman had no means to act on and made no effort to carry out. This is not to suggest that Mr. Goodman should have spoken

---

[107] Plaintiff's Interrogatory Responses, Interrogatory 9.

[108] Hayes Deposition at 7.

[109] Plaintiff's Interrogatory Responses, Interrogatory 9.

[110] *Id.*

[111] *Id.*

[112] *See supra* ¶¶ 6-8.

[113] *See generally* Hayes Deposition.

[114] *Id.* at 36-37.

[115] *Id.* at 61.

14

to Dep. Hayes as he said that Mr. Goodman did, but it did not require the level of force Dep. Hayes used.

60. It is my opinion: The force that Dep. Hayes used was unnecessary and inappropriate in the circumstances. Mr. Goodman was passively resistant, but Dep. Hayes grabbed him by the neck of his jumpsuit, dragged him across the floor, and threw him to the floor of a holding cell. Each of these uses of force was greater than necessary.

61. Even crediting Dep. Hayes's version of events, he grabbed Mr. Goodman's arm and elbow to lift him to a standing position and subsequently pulled him across the floor on his back to a holding cell, despite the fact that Mr. Goodman did not physically resist or try to attack Dep. Hayes. Those uses of force were also greater than necessary.

### Unnecessary and Inappropriate Force, Incident 2, Corporal Moissett

62. When Defendants Moissett, Repass, and Diggs came for Mr. Goodman to take him to his assigned cell, he accepted help getting into the wheelchair.[116]

63. While in transit somehow Mr. Goodman was dislodged from the wheelchair and fell onto the floor. He insists it was accidental;[117] Cpl. Moissett asserts that Mr. Goodman "purposefully threw his body out of the wheelchair" then refused all verbal commands to stand on his feet.[118]

64. Mr. Goodman states that Cpl. Moissett grabbed him off the floor in the corridor after falling out of the wheelchair, then slammed him back down again before cuffing his hands behind his back, and with the help of Dep. Diggs, dragging him down the corridor to a cell where he threw him onto the floor again.

65. Cpl. Moissett stated that when Mr. Goodman "refused" to get up, Deps. Diggs and Repass pulled him off the floor and each took one of his arms and "began escorting him down the hallway. Plaintiff became aggressive, and Deps. Diggs and Repass had to restrain him on the ground while I placed him in handcuffs." After that, Cpl. Moissett said Mr. Goodman was escorted to his cell and "complied with all verbal commands and all deputies exited the cell without further incident."[119] Cpl. Moissett's account omitted any force that he and Deps. Diggs and Repass used in the cell. When deposed in September 2021, Cpl. Moissett remembered little about his encounter with Mr. Goodman, and he said that he did not recall being at his cell or escorting them past the entry to the B wing.[120]

66. When asked at his deposition why he had not filed a report given his admission to cuffing Mr. Goodman, Cpl. Moissett testified that he did not need to submit a written statement because

---

[116] Plaintiff's Interrogatory Responses, Interrogatory 9.

[117] *Id.*

[118] Affidavit of Sergeant T.C. Moissett, Doc. No. 96-6 (Aug. 26, 2018); Moissett Deposition at 28.

[119] Affidavit of Sergeant T.C. Moissett, Doc. No. 96-6 (Aug. 26, 2018).

[120] *See supra* ¶ 28.

15

his handcuffing did not constitute force.[121] I note that VBSO's most recent Use of Force policy states, "*Unresisted* handcuffing does not comprise a use of force" (emphasis added).[122] If Cpl. Moissett believed that Mr. Goodman was not resisting, that does not justify the use of additional physical force. And if Cpl. Moissett believed that Mr. Goodman was resisting, then he was required to submit a written incident report.

67. Cpl. Moissett also confirmed that Mr. Goodman never attempted to attack – to kick, punch, or headbutt – him or either of the two deputies.[123]

68. It is my opinion: The force that Cpl. Moissett used was unnecessary and inappropriate in the circumstances. Mr. Goodman was passively resistant, but Cpt. Moissett helped to slam Mr. Goodman onto the floor of the hallway, yanked his arms over his head to handcuff him, dragged him down the hallway, and slammed him to the floor of his new cell. Each of these uses of force was unnecessary.

69. Even if Cpl. Moissett were correct that his only physical role was to handcuff Mr. Goodman, that handcuffing was a greater use of force than was necessary.

70. There is something else to be said about Cpl. Moissett. Each officer is responsible for his or her use of force. However, Cpl. Moissett, by virtue of his rank, allowed Deps. Diggs and Repass to abuse Mr. Goodman. All three individuals utilized greater physical force than was necessary. Not only did Cpl. Moissett have a responsibility to lead by example, but he was their supervisor and superior officer, and should have ensured subordinate staff behaved appropriately.

**Unnecessary and Inappropriate Force, Incident 2, Deputy Diggs**

71. Dep. Diggs actively assisted Cpl. Moissett in exercising force on Mr. Goodman. Dep. Diggs took one of Mr. Goodman's arms and helped to slam Mr. Goodman to the floor, yank his arms while handcuffing him, and drag him down the hallway. Dep. Diggs also slammed Mr. Goodman onto the floor of the cell. And while on the floor as his cuffs were being removed, Dep. Diggs either stood or put his knee on Mr. Goodman's back.[124]

72. Dep. Diggs further acknowledged Mr. Goodman did not assault anyone and was passively non-compliant.[125]

73. It is my opinion: The force that Dep. Diggs used was unnecessary and inappropriate in the circumstances. Mr. Goodman was passively resistant, but Dep. Diggs slammed him into the

[121] Moissett Deposition at 56-57.

[122] 2020 Use of Force Policy, Stolle 085.

[123] Moissett Deposition at 44.

[124] Plaintiff's Interrogatory Responses, Interrogatory 9.

[125] Diggs Deposition at 37.

floor repeatedly, dragged him down a hallway, and stood on his back. Each of those uses of force was greater than necessary.

74. Even crediting Dep. Diggs' testimony that he only dragged Mr. Goodman "several feet"[126] down the hallway, rolled him onto his stomach to handcuff him, walked him to his cell, and put his knee on the T-3 area of Mr. Goodman's back, those uses of force were also greater than necessary.

**Unnecessary and Inappropriate Force, Incident 2, Deputy Repass**

75. Dep. Repass was the first of the three officers to interact with Mr. Goodman during this second interaction. She testified that he was upset about remaining overnight at VBCC and being in a cell without a bed.[127]

76. Dep. Repass did not recall in her deposition exactly how Mr. Goodman got into the wheelchair, but she did remember Cpl. Moissett took the chair and pushed it down the hallway. She stated that she and Dep. Diggs walked with him "just for safety, security purposes."[128]

77. According to Mr. Goodman, after he fell out of his wheelchair, Dep. Repass accompanied Dep. Diggs and Cpl. Moissett as they dragged him down the hallway to his cell. Once in his cell, Dep. Repass also repeatedly held Mr. Goodman's neck and face to the floor and knelt on his left hand and neck. At some point, she also pressed the pressure point behind Mr. Goodman's right ear.[129]

78. Dep. Repass admits that she accessed the pressure point behind Mr. Goodman's right ear, although she testified that she did this while Cpl. Moissett and Dep. Diggs were handcuffing Mr. Goodman in the hallway.[130] According to Dep. Repass, she was one of the officers who lifted Mr. Goodman to his feet and tried "to pull him down the hallway," and eventually escorted him to his cell once he was handcuffed.[131]

79. Once in the cell, Dep. Repass stated Mr. Goodman was compliant – she "asked" him to kneel down to remove his cuffs then she "assisted" him to the floor – and all the deputies exited without any further incident.[132]

80. It is my opinion: The force that Dep. Repass used was unnecessary and inappropriate in the circumstances. She used a pressure point control tactic to inflict pain, knelt on Mr. Goodman's

---

[126] *Id.* at 32.

[127] Repass Deposition at 18.

[128] *Id.* at 15-16.

[129] Plaintiff's Interrogatory Responses, Interrogatory 9.

[130] Repass Deposition at 22.

[131] *Id.* at 20-21, 26.

[132] *Id.* at 28-30.

neck and hand, and pushed his face into the floor. Each of these uses of force was greater than necessary.

81. Even according to Dep. Repass's version of events, she helped pull Mr. Goodman down at least part of the hallway, and she admits that she used a pressure point. Those uses of force were also greater than necessary.

## IV.  Summary and Conclusions

82. It is my opinion: Defendants Hayes, Moissett, Diggs, and Repass all used unnecessary and inappropriate force that was greater than needed to maintain control of Mr. Goodman. Defendants failed to act in accordance with the standards for use of force with which I am familiar, based on my experience. They also failed to act in accordance with the VBSO policies and training materials that I have reviewed.

83. Mr. Goodman was 57 years old in 2012; he was in poor health and could not ambulate without a wheelchair or a cane. His VBCC medical chart noted that he had had a stroke in 1995, and four heart catheterizations and two heart attacks between 2003 and 2010. Mr. Goodman had also sustained spinal cord injuries for which he had had cervical fusion on his neck and back with limited results. Mr. Goodman also suffered from depression and service-related PTSD. In 2012, he was taking six prescribed medications to treat his medical and mental health conditions.

84. The VBCC was not only aware that Mr. Goodman was in poor health and had significant physical limitations, but Classification had also determined that he had no history of assaults or fights and that his custody level was minimum security. Rarely, in my experience, is a low custody inmate subjected to a use of force. It is even rarer that a low custody inmate is the subject of continual uses of force over two shifts by four officers and yet never a subject of disciplinary action by any of them.

85. Mr. Goodman was physically unable to comply with Defendants' orders to get up from the floor and to walk any distance on his own accord without a cane or a wheelchair. He was also physically incapable of staying overnight in a cell where there was no bed. He made repeated efforts to convey this information to Defendants and to request reasonable accommodations.

86. Defendants were aware of Mr. Goodman's limitations. Earlier that morning, Dep. Hayes recalled seeing Mr. Goodman in the Intake area walking with the aid of a cane or a walker. Mr. Goodman told Dep. Repass that he needed a wheelchair, and she asked Cpl. Moissett to get one for him, which he did. Mr. Goodman repeatedly told all four Defendants that he could not walk without assistance and that he had neck and back pain.

87. None of the Defendants, however, ever contacted the Classification or Medical units or a superior officer to ask about Mr. Goodman's cell assignment given his well-documented infirmities. Instead, Defendants withheld Mr. Goodman's access to a wheelchair. When Mr. Goodman fell to the floor in the Intake area, Dep. Hayes dragged him by his arms, on his back, along a concrete floor to a temporary holding cell. When Mr. Goodman fell out of the wheelchair enroute to his cell in the next building, Dep. Diggs and Cpl. Moissett pulled him the length of the hallway to his cell.

18

88. Defendants used other forms of unnecessary and inappropriate force. Dep. Hayes, Dep. Diggs, and Cpl. Moissett each dragged him across the ground and slammed him to the floor at various points. Cpl. Moissett and Dep. Diggs yanked his arms back and handcuffed him. Dep. Diggs knelt on his back. Dep. Repass pushed his head and neck into the floor, knelt on his hand, and utilized pressure point techniques as pain compliance.

89. Defendants were unable or unwilling to identify and to differentiate escalating from deescalating conditions. For example, when Mr. Goodman dropped his weight to the floor or refused to walk (because he was unable to do so without assistance), these were not escalations that required greater use of force; rather, this was passive non-compliance.

90. Mr. Goodman remained passively non-compliant throughout both encounters, first with Dep. Hayes, and then with Cpl. Moissett and Deps. Diggs and Repass. He never took a swing, kicked, or tried to attack any of the officers in any way.

91. The force that Defendants used seriously injured Mr. Goodman. He continues to suffer severe pain in his left hand, right shoulder, neck, and back, and his mobility has been greatly impaired.

92. It is my opinion: Defendants are responsible for using unnecessary and inappropriate force on Mr. Goodman.

I reserve the right to modify, supplement, or amend the opinions expressed in this report if additional information becomes available.

_____

Dora B. Schriro

# APPENDIX A

## DORA B. SCHRIRO, Ed.D.  J.D.
EXECUTIVE EXPERIENCE

*State of Connecticut*, Middletown CT (2014–2018)
**Commissioner**, Department of Emergency Services & Public Protection (2014–2018)
**CT Homeland Security Advisor** (2016–2018), DHS clearance, Top Secret, appointed by Gov. Dannel Malloy
- Responsible for CT State Police, Emergency Management & Homeland Security, Scientific Services, Fire Prevention & Control, Police Officer Standards & Training, Statewide Telecommunications
- FY2018 operating budget, $185M; federal grants, $348M; bond funding, $79M; 1817 employees
- Public Safety & Service, Homeland Security, and Emergency Response, Recovery & Resiliency
- Accomplishments: A Comprehensive Procedural Justice Initiative with body-worn cameras for state police on patrol, a civilian complaint process, 21st century curricula for state & local police, annual reports of uses of force, traffic stops & police pursuits, an investigative protocol for officer-involved shootings, and an ICE-interface protocol; Drug Intervention & Enforcement, equipping all troopers and training first responders to administer naloxone, and convening a dark-web opioid taskforce; and Other Harm Reduction Efforts including a statewide cybersecurity investigative unit and comprehensive gun control

*City of New York*, New York, New York (2009–2014)
**Commissioner**, New York City Department of Correction, appointed by Mayor Michael Bloomberg
- Responsible for adult detention, prisoner processing, and operation of criminal court pens, an average of 12,000 inmates daily and 100,000 pretrial and city-sentenced inmate admissions annually
- FY2014 operating budget, $1.065B, capital budget, $691.9M; 10,440 employees
- Focus: Special Populations; Intake, Classification and Discharge Planning; Staff Accountability; Alternatives to Disciplinary Segregation; Alternatives to Detention
- Accomplishments: 1st U.S. Social Impact Bond funded program, adolescent pre-release initiative; Justice Reinvestment funded pre-release preparation for adults; pre-trial & post-plea diversion for the mentally ill; comprehensive reform of disciplinary segregation with clinical alternatives for special populations; centralized intake with risk & needs classification, gang identification, and discharge planning

*US Department of Homeland Security*, Washington DC (2009–2009)
**Senior Advisor to Secretary on ICE Detention and Removal**, appointed by DHS Sec. Janet Napolitano
**Director, ICE Office of Detention Policy and Planning**, appointed by ICE Asst. Sec. John Morton
- Focus: Design a civil, civil detention system meeting all its health and safety needs and legal requirements
- Authored, *2009 Report on ICE Detention Policies and Practices: A Recommended Course of Action for Systems Reform*, DHS' template to transform immigration detention and alternatives to detention
- Opened the Office of Detention Oversight and within the first 100 days, deployed detention experts to the field, reassigned facility inspections to occur outside of ERO, brought online the detainee locator and death notification systems, undertook review of IHSC, detention standards, and risk assessment, and reduced family detention to under 100 beds

*State of Arizona*, Phoenix, Arizona (2003–2009)
**Department Director**, Arizona Department of Corrections, appointed by Gov. Janet Napolitano
- Responsible for adult corrections and community supervision including 39,000 inmates and 7,200 parolees daily and 55,000 felons annually (21,000 admissions/11,500 case openings)
- FY2009 operating budget, $1.23B; 9,750 employees
- Focus: Systems reform, re-entry, victim services, strategic planning, privatization oversight
- Winner, 2008 Innovations in American Government, and its first prison-based reform awards recipient

Dora B. Schriro, Ed.D. J.D.
Page 2

*City of St. Louis*, St. Louis, Missouri (2001–2003)
**Commissioner of Corrections**, St. Louis City Division of Corrections, appointed by Mayor Francis Slay
- Responsible for adult detention, prisoner processing, and city probation and parole including 1,500 jail inmates and 2,000 offenders on supervision daily (9,000 admissions/63,000 bookings annually)
- FY2003 operating budget, $68M; 615 employees
- Focus: Population management, alternative sentencing initiatives, staff development
- Opened and operated the city's first combined police prisoner processing and detention center

*State of Missouri*, Jefferson City, Missouri (1993–2001)
**Department Director**, Missouri Department of Corrections, appointed by Gov. Mel Carnahan
- Responsible for adult corrections and probation and parole services including 28,000 prisoners and 65,000 offenders on community supervision daily, 35,000 admissions/72,000 case openings annually
- FY2002 operating budget, $500M; 11,000 employees
- Focus: Systems and sentencing reform, litigation reduction, restorative justice, capital construction
- Winner, Council of State Governments Innovations award program, and Innovations in American Government 1997 Finalist and 1998, 1999 and 2000 Semi-Finalist

*City of St. Louis*, St. Louis Missouri (1989–1993)
**Correctional Superintendent**, St. Louis City Division of Correction, appointed by Mayor Vince Schoemehl
- Responsible for 600 pre-trial and city sentenced inmates, 4,000 admissions annually
- FY1993 operating budget, $26M; 210 employees
- Focus: Court oversight, overcrowding, certified juveniles, community relations

*City of New York*, New York, New York (1984–1989)
**Assistant Commissioner**, New York City Department of Correction, appointed by Mayor Ed Koch
- Responsible for design and delivery of inmate programs services, programs development, grants
- Services provided to 100,000 pre-trial and city sentenced inmates annually by 200 employees
- Focus: Public-funded and accredited education, school-aged inmates; contracts management
**Assistant Deputy Director**, Office of the Mayor, Coordinator of Criminal Justice
- Grants administration, federal and state funded systems reforms, $189M annually
- Focus: Alternatives to detention, intermediate sanctions, policy analysis, applied research

## CONSULTING SERVICES

Dora B. Schriro Consulting Services, LLC (est. 2013), Expert, Corrections and Immigration innovation, evaluation, and advocacy. Clients include the California Department of Justice, Sheriff's Department, Hampton County, Massachusetts, American Civil Liberties Union, Southern Poverty Law Center, Human Rights First, Disabilities Rights California, and St. Louis University School of Law Clinic.

## EDUCATION

St. Louis University, St. Louis, Missouri, Juris Doctorate, School of Law (2002)
Columbia University, New York, New York, Doctor of Education, Teachers College (1984)
University of Massachusetts at Boston, Massachusetts, Master of Education (1980)
Northeastern University, Boston, Massachusetts, Bachelor of Arts cum laude (1972)

Dora B. Schriro, Ed.D. J.D.
Page 3

## MANAGERIAL PROGRAMS

Council of State Governments, Toll Fellowship (2018)
Harvard University, JFK School of Government, Innovations in Governance (2005)
Harvard University, JFK School of Government, Strategic Public Sector Negotiations (1996)
Harvard University, JFK School of Government, Senior Executives in State and Local Government (1992)

## HONORS AND AWARDS, INNOVATIONS

Innovations in American Government, 2008 Winner, Getting Ready: Keeping Communities Safe
Innovations in American Government, 2000 Semi-finalist, Correcting Corrections
Innovations in American Government, 1999 Semi-finalist, Constituent Services
Innovations in American Government, 1998 Semi-finalist, Pre-Promotional Training
Innovations in American Government, 1997 Finalist, Constituent Services
Council of State Governments, 1998 Innovations Award Winner, Waste Tire to Energy
Council of State Governments, 1997 Innovations Award Regional Finalist, Pre-Promotional Training
Council of State Governments, 1996 Innovations Award Finalist, Constituent Services

## OTHER HONORS AND AWARDS

U.S. Department of Justice, Office for Victims of Crime, Allied Professional Award, 2012
Florida Immigrant Advocacy Center, American Justice Award, 2011
Hofstra University (Hempstead, New York) Presidential Medal, 2010
National Governors Association, Distinguished Service to State Government Award, 2006
Arizona Parents of Murdered Children, Filling Empty Shoes, 2006 Honoree
Farmingdale Public Schools (Farmingdale, New York), Wall of Fame, 2001 Inductee
St. Louis Forum, Trailblazer Award, 2000
Association of Correctional Administrators, Michael Francke Award for Outstanding Leadership, 1999
Jefferson City (Missouri) Ten Most Influential Women, 1998
Missouri Governor Award for Quality and Productivity, 1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000
Missouri Governor Torch of Excellence Gold Award, 1999
Missouri Governor Torch of Excellence Award, 1997
International Association of Correctional Training Personnel Award, Pre-Promotional Training, 1996
Women's Self-Help Center, Twenty Distinguished Women, 1996
St. Louis (Missouri) YWCA Special Leadership Award for a Government Official, 1995
Jefferson City (Missouri) News Tribune Statesman of the Month, June 1995

## PUBLICATIONS, IMMIGRATION DETENTION REFORM

*On the Other Side of the Looking Glass: COVID-19 Care in Immigration Detention*, MDPI, Soc. Sci. 2021, 10(10)
*Access to Counsel in Immigration Detention in the Time of COVID-19*, ABA Commission on Immigration (2020)
*Weeping in the Playtime of Others: The Obama Administration's Reform of ICE Family Detention Practices,* in
Journal on Migration and Human Security, The Law that Begot the Modern U.S. immigration Enforcement
System: IIRIRA 20 Years Later (December 2018)
*Women and Children First: An Inside Look at the Impediments to Reforming Family Detention in the U.S.,* in
Challenging Immigration Detention, ed. by Flynn and Flynn. Edward Elgar Publishing (September 2017)
*Afterword, Intimate Economies, Anomie and Moral Ambiguity,* in Intimate Economies of Immigration Detention:
Critical Perspectives, ed. by Conlon and Hiemstra. Routledge Publishers (2016)
*Improving Conditions of Confinement for Immigrant Detainees: Guideposts toward a Civil System of Civil Detention* in
The New Deportation Delirium, ed. by Kanstroom and Lykes. NYU Press (2015)
*Family Immigration Detention: The Past Cannot be Prologue*, ABA Commission on Immigration (2015)

Dora B. Schriro, Ed.D. J.D.
Page 4

*Envisioning a Civil System of Civil Detention: Our Opportunity, Our Challenge* (Foreword), in Outside Justice, ed. by Brotherton, Stageman and Leyro. Springer Press (2013)

Improving Conditions of Confinement for Criminal Inmates and Immigrant Detainees, American Criminal Law Review, Georgetown University Law Center (Fall 2010)

The 2009 Report on ICE Detention Policies and Practices: A Recommended Course of Action for Systems Reform, U.S. Department of Homeland Security (October 2009)

Rethinking Civil Detention and Supervision, Arizona Attorney (July–August 2009)

## PUBLICATIONS, CORRECTIONS REFORM

*Smart and Safe: Making the Most of Adolescents' Time in Detention, the Physical Plant, Our Workforce, and the "What Works' Literature,* in The State of Criminal Justice, American Bar Association (2013)

*Corrections: The Justice-Involved Mentally Ill, A Practitioner's Perspective,* in The State of Criminal Justice, American Bar Association (2012)

*Good Science, Good Sense: Making Meaningful Change Happen – A Practitioner's Perspective,* Criminology & Public Policy, Vol. 11, No. 1, Special Issue (February 2012)

*Is Good Time a Good Idea?* Federal Sentencing Reporter, Vol. 21, No. 3 (February 2009)

*Correcting Corrections: The Arizona Plan: Creating Conditions for Positive Change in Corrections,* Confronting Confinement: A Report of the Commission on Safety and Abuse in American Prisons (2006)

*Missouri's Parallel Universe: Blueprint for Effective Prison Management,* Corrections Today (April 2001)

*Correcting Corrections: Missouri's Parallel Universe,* Papers from the Executive Sessions on Sentencing and Corrections, U.S. Department of Justice, Office of Justice Programs (May 2000)

*Avoiding Inmate Litigation: The 'Show-Me' State Shows How,* Sheriff's Magazine, (March–April 1999)

*Best Practices: Excellence in Corrections,* American Correctional Association (August 1998)

*Reducing Inmate Litigation,* Corrections Today (August 1998)

Corrections Management Quarterly, Issue Editor, Aspen Publications (1997)

Currents, Leadership St. Louis, Danforth Foundation (1992)

*What Makes Correctional Education Educational,* Journal of Correctional Education (September 1986)

Safe Schools, Sound Schools, ERIC Clearinghouse on Urban Education (January 1985)

*What Works with Serious Juvenile Offenders: US Experience,* Juvenile Delinquency in Australia (1984)

What Makes Correctional Education Educational: Ethnography of an Instructionally Effective School, University Microfilm (1983)

## STANDARDS, SENTENCING AND RELATED CIVIL-CRIMINAL JUSTICE REFORM ACTIVITIES

Women's Refugee Commission, Commissioner (2012–2021)

American Bar Association, Commission on Immigration, Special Advisor (2019–2021)

American Bar Association, Commission on Immigration, Advisory Board Member (2017–2019)

American Bar Association, Commission on Immigration, Standards for the Custody, Placement and Care; Legal Representation, and Adjudication of Unaccompanied Alien Children in the United States (2018)

U.S. Dept. of Homeland Security, DHS Family Residential Ctr. Advisory Committee, member (2015–2016)

American Bar Association, Commission on Immigration, Commissioner (2014–2016)

American Bar Association, Commission on Immigration, Co-chair, Standing Subcommittee on Punitive Segregation, (2012–2014)

American Bar Association, Commission on Immigration, Civil Detention Standards Task Force (2011–2012)

American Bar Association, Criminal Justice Standards Subcommittee, ACA representative (2005–2008)

Dora B. Schriro, Ed.D. J.D.
Page 5

Arizona State University School of Law, Sentencing Policy Seminar (2004–2005)
Arizona Attorney General Sentencing Advisory Committee (2004–2008)
St. Louis University School of Law, Instructor, Sentencing Policy Seminar (2000–2002)
Missouri Sentencing Advisory Commission, Vice Chair (1994–2001)
U.S. Department of Justice Executive Sessions on Sentencing and Corrections, in conjunction with Harvard University JFK School of Government and University of Minnesota Law School (1997–2000)
Partnership for Criminal Justice Workshop, Institute on Criminal Justice, University of Minnesota Law School, State Partner (1997–2000)
State Sentencing and Corrections Program, Vera Institute of Justice, National Associate (1999–2002)
U.S. Dept. of Justice, Bureau of Justice Assist., Discretionary Grant Program, Peer Reviewer (1994–2002)

## PRE-DOCTORAL EMPLOYMENT, LECTURING AND RELATED EXPERIENCE

Employment
- Executive Director, Planned Parenthood of Bergen County, Hackensack, New Jersey (1983–1984)
- Director, Correctional Education Consortium, Long Island City, New York (1982–1983)
- Supervising Social Worker, Franklin Public Schools, Franklin, Massachusetts (1978–1981)
- Director, Adult and Continuing Education, Franklin Public Schools, Franklin, MA (1978–1981)
- Director, Staff Development, Wrentham State School, Wrentham, Massachusetts (1977–1978)
- Program Administrator, Medfield-Norfolk Prison Project, Medfield, Massachusetts (1974–1976)

Academic Experience
- Instructor, Arizona State University School of Law, Corrections Law Seminar (2005–2008)
- Instructor, St. Louis University School of Law, Sentencing Policy (2000–2002)
- Senior Policy Fellow, Public Policy Research Center, University of Missouri-St. Louis (2001)
- Visiting Lecturer, Strategic Planning, National Institute of Corrections (1998–2002)
- Adjunct Professor, Criminal Justice, University of Missouri-St. Louis (1990–1998)
- Adjunct Professor, Criminal Justice, Long Island University at CW Post (1986–1988)
- Instructor, Innovation, Open Center of New York City (1987)
- Teaching Assistant, Field Research Methodology, Administrative Intern to the School Superintendent, Franklin Public Schools, Franklin, Massachusetts (1979)
- Visiting Lecturer, Special Education, Framingham State College, Framingham, Massachusetts (1979)
- Adjunct Professor, Psychology, Fischer Junior College, Boston, Massachusetts (1978)

Related Activities
- Institutional Research Board, St. Louis University (2002–2003)
- Institutional Research Board, University of Missouri-St. Louis (2001–2003)

**Contact information:**

611 King Avenue
City Island, NY 10464
917-710-7029
dora.schriro@gmail.com

Professional References available upon request

# APPENDIX B

# Materials Considered

<u>Docket Entries</u>

- Second Amended Complaint, Doc. No. 47 (No. 1:13-cv-540)
- Affidavit of Capt. Linda Richie, Doc. No. 74 (No. 1:13-cv-540)
- Affidavit of Deputy C. Hayes, Doc. No. 96-3 (No. 1:13-cv-540)
- Affidavit of Deputy C. Repass, Doc. No. 96-4 (No. 1:13-cv-540)
- Affidavit of Deputy Z. Diggs, Doc. No. 96-5 (No. 1:13-cv-540)
- Affidavit of Sgt. T.C. Moissett, Doc. No. 96-6 (No. 1:13-cv-540)

- Opinion, Doc. No. 62 (No. 18-7315)

<u>Case Materials</u>

- Plaintiff's Responses to Defendants' First Set of Interrogatories (June 9, 2021)
- Defendant Diggs' Objections and Answers to Plaintiff's First Set of Interrogatories (July 8, 2021)
- Defendant Hayes' Objections and Answers to Plaintiff's First Set of Interrogatories (July 8, 2021)
- Defendant Moissett's Objections and Answers to Plaintiff's First Set of Interrogatories (July 8, 2021)
- Defendant Repass' Objections and Answers to Plaintiff's First Set of Interrogatories (July 8, 2021)
- Linda Richie Deposition Transcript and Exhibits
- Crystal Repass Deposition Transcript and Exhibits
- Ronald Asuncion Deposition Transcript and Exhibits
- Curtis Hayes Deposition Transcript and Exhibits
- Todd Moissett Deposition Transcript and Exhibits
- Zachary Diggs Deposition Transcript and Exhibits

<u>Produced Documents</u>

- CHSSF00000207
- DGG00000001
- DGG00000002
- STOLLE 001
- STOLLE 016
- STOLLE 070
- STOLLE 075
- STOLLE 097
- STOLLE 302
- STOLLE 575
- STOLLE 584
- STOLLE 745

- STOLLE 751
- STOLLE 1105
- STOLLE 1115
- STOLLE 1335
- STOLLE 1343
- VADOC00000001

Other Materials

- Virginia Beach Sheriff's Office, Inmate Rulebook (updated May 2019)
- Virginia Beach Sheriff's Office, Inmate Rulebook (updated May 2021)
- Michael Schlosser and Dallas Schlosser, "Gaining Compliance with Targeted Pressure," Police Magazine (Apr. 7, 2016), https://www.policemag.com/342012/gaining-compliance-with-targeted-pressure.
- Craig Hemmens and Eugene Atherton, Use of Force Current Practice and Policy, ACA: Alexandria VA, 1999.