**Exhibit 2**

**Expert Report of Scott H. Barlow**
_____

**David Graham Goodman v. Kenneth W. Stolle, et al.**
**US District Court for the Eastern District of Virginia, Norfolk Division**
**Civil Action No. 1:13cv540**

The following report provides my opinions regarding the plaintiff's allegations against Deputy Curtis Hayes, Corporal Todd Moissett, Deputy Zachary Diggs, and Deputy Crystal Repass in the above noted lawsuit filed by David Graham Goodman. I have relied upon my extensive personal experience and training in the field of use of force, which I developed as a police officer, department of criminal justice services (DCJS) certified law enforcement trainer (firearms, arrest control/use of force, and general law enforcement topics), Chief of Police (retired), and former Deputy Director and current Executive Director at the Hampton Roads Criminal Justice Training Academy responsible for the certification of law enforcement officers, jail (correctional) officers, civil process officers, courtroom security officers, and dispatchers.   I state my opinions based upon a reasonable degree of certainty in my area of expertise.

**Documents Reviewed**

I have reviewed the following documents related to this matter:

1. Second Amended Complaint
2. Plaintiff's Rule 26(a)(2)(b) Expert Disclosures
    - Expert Dora B. Schriro's October 8, 2021 Report
3. Plaintiff's Responses to Defendants' First Set of Interrogatories and Request for Production of Documents
4. Defendant Diggs' Objections and Answers to Plaintiff's First Set of Interrogatories
5. Defendant Hayes' Objections and Answers to Plaintiff's First Set of Interrogatories
6. Defendant Moissett's Objections and Answers to Plaintiff's First Set of Interrogatories
7. Defendant Repass' Objections and Answers to Plaintiff's First Set of Interrogatories
8. Inmate Statement (DGG00000001-00000003)
9. Use of Force Incident Report Form 12-11-026 from Deputy C. Repass (STOLLE 071).
10. Use of Force Incident Report Form 12-11-25 from Deputy C. Hayes (STOLLE 070).
11. Memorandum dated Nov. 7, 2012 from Deputy Diggs to Sgt. Roland (STOLLE 072).
12. VBSO Jail and Medical records (STOLLE 001-033)
13. VBSO Policies and Procedures (STOLLE 075-096, 1343-1348)
14. VBSO Professional Standards and Accountability Policy (STOLLE 077-082)
15. VBSO Use of Force Lesson Plans (STOLLE 097-301)
16. VBSO Inmate Rulebook (updated May 2019)
17. VBSO Inmate Rulebook (updated May 2021)
18. Chesapeake Sheriff's Office Records (CHSSF00000001-00000233)

19. Training and Personnel records of Hayes, Moissett, Diggs and Repass (STOLLE 302, 575, 584, 745, 751, 1105, 1115, 1335)
20. Affidavit of Capt. Linda Richie, Doc. No. 74 (No. 1:13-cv-540)
21. Affidavit of Deputy C. Hayes, Doc. No. 96-3 (No. 1:13-cv-540)
22. Affidavit of Deputy C. Repass, Doc. No. 96-4 (No. 1:13-cv-540)
23. Affidavit of Deputy Z. Diggs, Doc. No. 96-5 (No. 1:13-cv-540)
24. Affidavit of Sgt. T.C. Moissett, Doc. No. 96-6 (No. 1:13-cv-540)
25. Deposition of Linda Richie (September 8, 2021)
26. Deposition of Ronald Asuncion (September 9, 2021)
27. Deposition of Todd Moissett (September 10, 2021)
28. Deposition of Crystal Repass (September 8, 2021)
29. Deposition of Zachary Diggs (September 10, 2021)
30. Deposition of Curtis Hayes (September 9, 2021)
31. Deposition of David G. Goodman (October 12, 2021)
32. Hampton Roads Criminal Justice Training Academy, Lesson Plans: Basic Jailor
33. Hampton Roads Criminal Justice Training Academy, Lesson Plans: Use of Force.

**Summary of the Incidents**

Plaintiff's complaint seeks damages for injuries to Mr. David G. Goodman while incarcerated in the Virginia Beach Correctional Center (VBCC) on November 7, 2018.

On November 7, 2018, Mr. Goodman was transported from the VBCC to the Virginia Beach Circuit Court for a hearing on charges of a probation violation for and underlying malicious wounding conviction. Following the court hearing, Mr. Goodman returned to the VBCC where he was verbally abusive to the intake staff. Deputy Curtis Hayes was called to the intake area to move Mr. Goodman from intake to a cell. Mr. Goodman originally sat in the wheelchair for the transport, but once he learned where he was going, without instructions to do so, he exited the wheelchair and sat on a nearby bench. He was mad about having to remain overnight at the VBCC instead of returning to the Chesapeake Correctional Center where he was previously housed. When Deputy Hayes instructed him to get back into the wheelchair, he refused and became verbally abusive, stating "fuck you punk, I'll beat your fucking ass." Mr. Goodman would not comply with the instructions to return to his wheelchair to be taken to the holding cell.

Deputy Hayes assisted Mr. Goodman off of the bench by taking a hold of Mr. Goodman's left arm, standing him up. Deputy Hayes began to escort Mr. Goodman to a holding cell. Mr. Goodman then "dropped his weight" and fell to the floor. When instructed by Deputy Hayes to get off of the floor and go into his cell, Mr. Goodman, again, became verbally abusive, stating "Fuck you punk, I'm not doing it." He, again, refused the commands of Deputy Hayes. Deputy Hayes was forced to drag Mr. Goodman into the cell. Once at the cell, Mr. Goodman continued to resist by placing his foot in front of the cell door. Despite Mr. Goodman's efforts to prevent the cell door from closing by using his foot, Deputy Hayes was eventually able to close the cell door.

Later that day, Deputy Crystal Repass arrived at Mr. Goodman's cell to move him internally from the holding cell to another cell.  Mr. Goodman refused, stating that he could not walk.  Deputy Repass asked Corporal Todd Moissett to get a wheelchair to assist with moving Mr. Goodman. Mr. Goodman continued to act in an aggressive and agitated manner, to include threatening "to blow the brains out" of a deputy he had contact with from a previous encounter. Deputies had been briefed that Mr. Goodman had been aggressive and threatening throughout the classification and intake process.

Corporal Moissett arrived with the wheelchair, and Deputy Repass then asked Mr. Goodman to sit in the wheelchair on numerous occasions.  Mr. Goodman would not comply and was assisted into the wheelchair by Corporal Moissett, Deputy Diggs, and Deputy Repass.  Corporal Moissett began pushing Mr. Goodman down the hall to the appropriate location.  While Mr. Goodman claims he "doesn't know" how he ended up on the floor, Corporal Moissett, Deputy Diggs and Deputy Repass testified Mr. Goodman pushed himself up and intentionally fell from the chair onto the floor.

Deputy Repass, again, instructed Mr. Goodman numerous times to sit back in the wheelchair.  Mr. Goodman continued to refuse.  The deputies attempted to assist Mr. Goodman back into the chair, but he continued to resist.  Mr. Goodman was handcuffed and escorted (walked), with deputies on each side of him, to the required cell.  As deputies walked Mr. Goodman through several doorways he began banging his head on the doorframes.  Deputies attempted to stop Mr. Goodman's attempts to injure himself but were only partially successful.

Upon arrival to Mr. Goodman's new cell, handcuffs were removed and he was secured in the cell.  Deputies asked Mr. Goodman if he needed medical attention which he refused.  Even though Mr. Goodman refused medical attention, as a precaution, he was seen by Nurse C. Hoyles who medically cleared him.  Supervisory staff Sergeant M. Keogh, and Sergeant W. Roland were notified of the incident.

**Expert Findings**

**1. Compliance with Use of Force Standards**

A correctional officer may use a reasonable level of force to move an inmate from one location to another.  It is well-established that managing a jail facility requires a high level of control of inmates for the safety of both the inmate and the correctional officers. There are two types of control used in a correctional facility:

- **Informal control** – using communication skills to get inmates to voluntarily comply without resorting to official action.

- **Formal control** – Use of reasonable force, officially "writing up" the inmate, criminal charges.

Force that is recognized as "privileged" for law enforcement must occur in the following situations:

1. Self-defense
2. Defense of a third person
3. Effecting an arrest (enforcing rules)
4. Prevent an escape
5. Prevent the commission of a crime.

Established Related Court Decisions:

Use of force is judged by the Objective Reasonableness Standard as established by the United States Supreme Court in *Graham v. Connor*, 490 U.S. 386 (1989). Law enforcement officers may use reasonable force to make an arrest or to protect themselves or others. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, and its calculus must embody an allowance for the fact that police are often forced to make split second decisions about the amount of force necessary in a particular situation."

Further, with respect to pretrial detainees, excessive force claims fall under the ambit of the Fourteenth Amendment's Due Process clause. *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). The Supreme Court has stated that the "'core judicial inquiry'" in an Eighth Amendment excessive force claim, is "'whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Wilkins v. Gaddy*, 559 U.S. 34 (2010); *Hudson v. McMillian*, 503 U.S. 1 (1992). Thus, in determining whether the use of force against a pretrial detainee was "excessive," the Court considers whether the force "was objectively unreasonable." *Kingsley*, 576 U.S. at 397. "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case." *Kingsley* (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989)).

The primary questions to be addressed are as follows:

1. The need for the application of force;
2. The relationship between that need and the amount of force used;
3. The extent, if any, of the injury inflicted; and
4. Whether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm.

Further, restraint equipment (i.e. handcuffs) is used in a variety of circumstances. The primary reasons are as follows:

1. Maintain control
2. Prevent attack
3. Prevent escape
4. Prevent destruction of evidence

Types of Subject Resistance:

- Intimidation
- Hiding of Hands
- Verbal Resistance
- Verbal Aggression
- Passive Resistance
- Defensive Resistance
- Active Aggression
- Aggression With Weapon

Force Response Options:

- Presence of Authority
- Verbal Direction- (Used in conjunction with every other force response when it is reasonable to employ)
- Soft Empty Hand Control
- Less Lethal Control
- Hard Empty Hand Control
- Impact Weapon
- Strikes to Extreme Target Areas
- Lethal Force Response

When applying established "best practices" and "training protocols" it is clear that Deputy Curtis Hayes', Corporal Todd Moissett's, Deputy Zachary Diggs', and Deputy Crystal Repass' use of force was reasonable and appropriate under the circumstances they encountered on November 7, 2018. They all had the authority to move Mr. Goodman. Mr. Goodman did not want to comply.

During the first incident, Mr. Goodman made verbal threats (Verbal Aggression), then escalated to passive resistance, and then defensive resistance. Deputy Curtis Hayes responded with verbal directions then escalated to empty hand control. Deputy Hayes then transported an unwilling Mr. Goodman to his cell. Deputy Hayes acted reasonably under the circumstances, complied with the recognized training standards and, specifically, the Virginia Beach Sheriff's Office Use of Force policy. None of the force used by Deputy Hayes was greater than reasonable.

During the later incident, Mr. Goodman, again, made verbal threats (Verbal Aggression), then escalated to passive resistance, and then defensive resistance. The deputies responded with verbal directions then escalated to empty hand control. The deputies utilized a wheelchair to assist in transporting Mr. Goodman which is accepted practice. Mr. Goodman threw himself on the floor, from the wheelchair. The deputies attempted verbal direction, then soft empty hand control to place him back in the wheelchair, unsuccessfully. Deputies then utilized restraints, which is done for the safety of both the deputies and the inmate, and escorted Mr. Goodman down the hall. The utilization of restrains (handcuffs) was appropriate based on Mr. Goodman's

level of aggression and attempting to harm himself. The decision to not place Mr. Goodman back in the wheelchair was also appropriate due to Mr. Goodman's attempt to injure himself. It was reasonable for Deputy Diggs to roll Mr. Goodman onto his stomach to handcuff him, walk him to his cell, and place his knee on Mr. Goodman's shoulder blades. It was reasonable for Deputy Repass to use a pain and compliance technique with the intent to gain compliance. This is a low level of force and appropriate to gain compliance. Mr. Goodman was trying to get out of their control (defensive resistance). Once Mr. Goodman was contained, the deputies de-escalated by removing handcuffs and securing Mr. Goodman in a holding cell.

**Summary**

The force used by Deputy Curtis Hayes, Corporal Todd Moissett, Deputy Zachary Diggs, and Deputy Crystal Repass was reasonable and consistent with nationally recognized standards, case law and the Virginia Beach Sheriff's Office's Use of Force Policy. The deputies' use of force decisions comply with the internal polices of the Virginia Beach Sheriff's Office as well as with national and state training guidelines and the national and state policy guidelines of the Virginia Department of Criminal Justice Services (DCJS) and the Commission on Accreditation for Law Enforcement Agencies (CALEA).

I submit my report subject to revision if so required by the provision of further information or additional documents.

October 27, 2021

Scott H. Barlow